## THE ALINE.

## WESSELS v. THE ALINE.

*(Circuit Court, E. D. New York. August 31, 1885.)*

1. CARRIER OF GOODS BY WATER—DISCHARGE OF CARGO OF ORANGES IN FREEZING WEATHER—SHIP HOW FAR LIABLE FOR DAMAGES.

    The steam-ship A. arrived in the port of New York, from Kingston, Jamaica, on the twenty-ninth of December, 1880, having on board a consignment of oranges for one W. The weather on the 29th, and for some days after, was extremely cold. On the morning of the 29th, W., hearing of the arrival of the steamer with his consignment, procured a custom-house permit to land the fruit, and gave the steam-ship company a check for the freight. In the afternoon of the same day, however, concluding that it was too cold to discharge green fruit, he gave notice not to discharge his oranges, and he did not surrender the custom-house permit. Notwithstanding this, the oranges were discharged, and were speedily frozen. On learning of this, W. stopped payment of his check for the freight and abandoned the fruit, giving notice to the steam-ship of his action, and he subsequently libeled the vessel for the full value of the oranges. *Held,* that the steam-ship was guilty of negligence in discharging the fruit at an improper time and against the objection and protest of the libelant.

2. SAME—BILL OF LADING—INVOICE VALUE.

    The bills of lading contained a clause limiting the liability of the steamer to the invoice value of the goods shipped. No evidence of what the invoice value was, was given in the district court. The district judge held that, under the circumstances, as the oranges had not only been frozen, but forfeited to the government by being landed without a permit, the libelant was entitled to recover the sound value of the fruit in New York, less the freight, *i. e.,* $5,-784.01. On appeal, new evidence being introduced as to the invoice value, *held,* that as, in accepting the bills of lading, the shipper accepted the terms of the contract they contained, the libelant could not, under the limiting clause in the bill of lading, recover more than the invoice value, for which, less the freight, *i. e.,* for $733.27, decree was rendered.

3. SAME—"EFFECT OF CLIMATE."

    "Effect of climate" in the sentence "effect of climate or heat of holds," in a bill of lading, means the effect of climate in the passage of the vessel from a tropical climate northward, or *vice versa,* during the voyage, in its action on cargo in the vessel, and not such exposure as occurred in this case

### FINDING OF FACTS BY COURT.

(1) The libelant, Gerhard Wessels, was and is a merchant doing business in the city of New York.

(2) The steam-ship Aline mentioned in the libel herein was and is owned by the Atlas Steam-ship Company, (Limited,) the claimant, a corporation organized and existing under the laws of the Kingdom of Great Britain and Ireland. She was, long prior to the filing of the libel herein, and continued to be down to that time, one of a regular line of steamers, some of which belonged to and others were chartered by the claimant, and all of which were managed by it, and which formed a regular line of common carriers for the carriage of passengers, mails, and cargo, between the port of New York and divers ports in the West India islands, one of which was the port of Kingston, in the Island of Jamaica.

(3) The steamers of said line had regular days of sailing from the port of New York and the port of Kingston, aforesaid, which were advertised for about a month in advance, and which, with some few exceptions, were regularly kept, and were relied upon by persons dealing with said line, for the

transportation of passengers and freight, and also by the government of the United States and of the island of Jamaica, for the transportion of the mails.

(4) The said steam-ship Aline and the other steam-ships of said line were general ships, and carried cargoes of various descriptions and for divers persons, as common carriers thereof.

(5) The libelant had, for many years prior to the month of December, 1880, been engaged in commerce between the island of Jamaica and the port of New York, and, in the course of such commerce, had had frequent dealings with the claimant, and had frequently intrusted the claimant with oranges to be transported from the island of Jamaica to the port of New York, and he was, during the month of December, 1880, and long prior thereto, well acquainted with the facts specified in the second, third, and fourth findings, and with the custom of the said line, and of the port of New York, specified in the eighth finding.

(6) In the month of December, 1880, the said steam-ship, which was a vessel of 2,200 tons gross tonnage, was loading in the port of Kingston, in the island of Jamaica, and bound thence to the port of New York. The firm of John C. Fagan & Co., on the twenty-second day of December, 1880, at Kingston, delivered to the said steam-ship Aline 1,230 barrels of oranges in apparent good order, to be delivered in like good order and condition to the libelant, subject to the terms and conditions stated in the bills of lading therefor, which were thereupon delivered by the claimant to the said shippers, and which are marked, respectively, "libelant's Exhibit 2," and "libelant's Exhibit 3." On the same day Richard White at the same place delivered to the said steam-ship 137 barrels of oranges, in apparent good order, to be delivered in like good order and condition to the libelant, subject to the terms and conditions stated in the bill of lading therefor, which was thereupon delivered by the claimant to the said shipper, and which is marked "libelant's Exhibit 4." On the same day W. Climie, at the same place, delivered to the said steam-ship 27 barrels of oranges, in apparent good order, to be delivered in like good order and condition to the libelant, subject to the terms and conditions stated in the bill of lading therefor, which was thereupon delivered by the claimant to the said shipper, and is marked "libelant's Exhibit 5." The 4 bills of lading and the stipulation in the apostles, dated January 30, 1883, were put in evidence by the libelants.

(7) The said steam-ship, having taken on board said merchandise, proceeded therewith to the port of New York, and arrived at her dock in New York, pier 51, North river, at about 1 o'clock in the afternoon of Wednesday, the twenty-ninth of December, 1880. She gave no notice of the time and place of discharge of said merchandise to the libelant.

(8) The custom of said line of steam-ships and of the port of New York, at the time of the arrival of said steam-ship, was, and for years prior thereto had been, that merchants and others doing business in said city learned by telegraph that the steamers by which they ordinarily received, or by which they expected, cargo, had arrived off Sandy Hook, and thereupon said consignees inquired at the office of the line to which said steamer belonged for the manifests of the goods on board of said steamers respectively, and ascertained in this way what cargo they had on board consigned to them. Thereupon it was customary for the consignees of oranges from the West India islands to send to the wharf at which said steamer usually landed, and receive their fruit as fast as it was discharged from the steamer.

(9) The libelant ascertained early in the morning of the twenty-ninth of December, 1880, that said steamer had arrived at quarantine, and was on her way to her usual pier in said city of New York. Thereupon the libelant inspected the manifest of said steam-ship Aline, and requested the claimant to make out a bill for the freight of the oranges on board of said steam-ship which were consigned to the libelant; and it, and the delivery order for the

cargo·described in it, were delivered to the libelant, who accepted the same, and gave to the claimant a check for the amount of said freight. The libelant also, on the morning of said day, applied to the collector of the port of New York, and received a permit from him for the landing and delivery of said oranges mentioned and described in said bills of lading, and the claimant also, on said day, applied for and obtained from said collector the license, claimant's Exhibit B; and Henry C.Wessels, a son of the libelant, and in his employ, took the said delivery order and permit, and went to the dock where the said steam-ship was lying.

(10) The weather was very cold at the time, and growing colder. It was snowing, and the wind was blowing strong from the north across the pier. The range of the Fahrenheit thermometer from and including December 29, 1880, to and including January 3, 1881, was as follows: December 29, maximum 15 deg., minimum 9 deg.; December 30, maximum 4 deg., minimum 5 deg. below zero; December 31, maximum 13 deg,, minimum 6 deg. below zero; January 1, maximum 21 deg., minimum 4 deg.; January 2, maximum 26 deg., minimum 13 deg.; January 3, maximum 35 deg., minimum 15 deg.

(11) The steam-ship Aline lay in the upper or north side of pier 51, North river. This pier is at the foot of Christopher street, on the upper or north side of Christopher-street ferry-slip. The pier is upwards of 400 feet long, built upon wooden spiles, and covered. The lower or south side of the pier formed the upper or north side of Christopher-street ferry-rack, and was boarded up. The north side of the pier, where the Aline lay, had some 12 openings; each opening being about 18 feet wide and 20 feet high, with two doors for each opening. The river end of the pier had a larger opening and door, and the street end of the pier had a large opening, with nothing but an open gate made of iron bars to protect it, and having an open place above it of about 18 to 20 feet, not closed at all, but always open and exposed to the weather.

(12) Jamaica oranges will chill at a temperature of 32 deg. Fahrenheit, and will freeze at 25 deg. Fahrenheit.

(13) There were on board of the said steam-ship at that time 3,872 barrels of oranges, consigned to 16 different consignees, which were stored on the upper or fruit deck of the said steamer. The remainder of her cargo was stored on the orlop and lower decks.

(14) The other consignees of said fruit, on the twenty-ninth of December, 1880, immediately upon learning of the approach of said steamer, ascertained from the claimant the amount and description of the fruit consigned to them, respectively, and requested that the same should be delivered to them. The said steamer, immediately upon arriving at the pier, opened her hatches and proceeded to discharge the barrels of oranges which were on her fruit deck, and 800 barrels thereof were placed upon the said pier before sunset on the twenty-ninth of December, 1880.

(15) It was impossible to discharge the oranges of the other consignees without discharging the oranges of the libelant, and the latter were unladen and put on the pier, part of them on the twenty-ninth, and part of them on the thirtieth, of December, 1880, and all against the objection and protest of the libelant. The oranges were frozen almost as soon as they were landed.

(16) The temperature and the weather were almost exactly the same when the libelant demanded and procured said permit and delivery order, and delivered to the claimant the check for the freight, as they were during the afternoon of that day.

(17) There has always been a custom and usage in the port of New York not to discharge oranges and green fruit from steam-ships or vessels when the weather is cold enough to injure them. Under such circumstances the fruit is kept on board of the vessel, and the cold outside does not injure it.

(18) On the arrival of Henry E. Wessels at the dock of the steam-ship, on

the afternoon of December 29, 1880, about half past 2 or 3 o'clock, he notified the superintendent of the dock, on behalf of the libelant, not to discharge his oranges from the steam-ship, for the reason that it was not fit weather to land green fruit, and declined to give him the delivery order. He also went to the custom-house officer in charge of the steam-ship, and told him, on behalf of the libelant, that he did not want the oranges discharged. He did not give him the custom-house permit.

(19) Between the time when the libelant obtained the said delivery order and permit and delivered said check to the claimant, and the time when he notified the claimant not to discharge his oranges, the hatches of said steam-ship had been opened, and some of the oranges in her had been discharged and landed upon said pier, and the whole had been exposed to the existing conditions of the weather.

(20) When Henry E. Wessels was at the pier of the steam-ship, three openings with six doors, on the north side of the pier, were open, and the doorway at the river end of the pier was partly open, and the opening at the street end of the pier was open, and the cold north wind and snow were blowing through the openings.

(21) After the libelant's oranges were discharged, he stopped payment of his check for the freight and abandoned the fruit, and gave notice of his action to the claimant, and returned to it the delivery order and the freight-bill. The oranges were afterwards sold at auction by the government for a very small sum, not enough to pay the freight and duty.

(22) The claimant, after receiving said notice not to land said oranges, continued the said discharge, and delivered the said oranges so laden on board to all of the consignees who would receive the same; and all of them except the libelant received the same, and removed them from said pier, and transported them to their respective warehouses.

(23) It would have been an injury to the claimant, and to divers persons dealing with it, if the discharge of the goods other than oranges on board of said steam-ship had been delayed until the temperature at the pier where she lay should reach the point at which oranges could be discharged and stored upon the pier without injury.

(24) The said steam-ship had advertised for about a month that she would sail from the port of New York on her return voyage to the ports of Aux Cayes, Jacmel, and Port au Prince, and that she would carry cargo, passengers, and mails, on the sixth of January, 1881, and divers persons in the city of New York had engaged freight for her voyage to said ports for said day, and she was under contract with the government of the island of Jamaica to carry the mails on her regular sailing days, and was also under contract to return with the mails, and to sail with them from the port of Kingston, in the island of Jamaica, on the twenty-seventh of January, 1881.

(25) The said steam-ship was bound on her outward trip from New York to said ports of Aux Cayes, Jacmel, and Port au Prince, and the postmaster of the United States for the city of New York had caused notice to be given that said steam-ship would depart with the mails for those ports on the sixth of January, 1881.

(26) The claimant used reasonable diligence to discharge the said steam-ship and load her with her outward cargo, so as to enable her to sail on the sixth of January, 1881, but there was so much ice in the river where she lay, and the weather was so severe, that it was unable to discharge her and complete the lading of cargo engaged, before the seventh of January, 1881, on which day she sailed from the port of New York upon her return voyage, and on said voyage she carried the mails intrusted to her by the United States government for the said last-mentioned three ports.

(27) There would have been risk to said steam-ship in discharging her cargo from her lower hold and her orlop deck, and leaving 3,872 barrels of or-

anges on her upper or fruit deck; the risk being that she might have capsized had such discharge taken place without discharging the fruit aforesaid. There had been instances prior to that time, in the port of New York, in which ballast-logs were used to steady steamers which for some reason were top-heavy, and prevent them from capsizing, but there was so much ice in the river that it might have happened that such ballast-logs could not have been towed along-side and secured to said steam-ship so as to guard against such risk.

(28) In the ordinary course of business it would not have been practicable for the claimant to have kept the said oranges on board until the weather should have moderated so that it would have been safe to discharge them without any apprehension of injury, and to then unload them and prepare the said steam-ship, and load her for her return voyage, so that she should be ready to sail on the seventh of January, 1881; but this might have been done by proper extra effort.

(29) It was stipulated and agreed in and by each of the bills of lading aforesaid, among other things, that the claimant should not be liable in any case for an amount exceeding the invoice cost of the oranges mentioned in said bill of lading. The invoice cost of the oranges so shipped by the said John C. Fegan & Co. were £328 9s. 1d.; the invoice cost of the oranges so shipped by the said Richard White was £40 12s. 2d.; the invoice cost of the oranges so shipped by the said W. Climie was £7 10s. 11d.; making in all £376 12s. 2d., sterling money of the United Kingdom of Great Britain and Ireland, equivalent in value, at $4.8665 to the pound sterling, to $1,832.76.

(30) As said oranges were discharged, the barrels containing the oranges of each owner were piled up by themselves, and, when the piles were as high as it was customary to pile them, they were covered by the claimant with tarpaulins in a proper manner.

(31) The freight for said oranges of the libelant from Kingston to New York on said steam-ship was $1,099.49.

(32) The sound market value of the libelant's oranges in the port of New York, on December 29, 1880, less the charges for the transportation of them by the steam-ship, was $5,784.01.

On the foregoing facts, I find the following conclusions of law:

(1) The steam-ship was guilty of negligence in discharging the libelant's oranges at an improper time, and also against the objection and protest of the libelant, in consequence of which they were frozen and injured almost as soon as they were landed.

(2) The libelant had the right to decline to pay the freight and to abandon the fruit, and hold the steam-ship liable for the proper damages.

(3) The libelant is entitled to recover from the steam-ship the invoice value of said oranges, namely, $1,832.76, less $1,099.49 freight due thereon, being $733.27, with interest thereon from December 29, 1880.

(4) The libelant is also entitled to recover from said steam-ship his costs in the district court, taxed at $215.65, and the claimant is entitled to recover from the libelant its costs in this court, to be taxed.

SAMUEL BLATCHFORD, Circuit Justice.

*Jas. K. Hill, Wing & Shoudy* and *R. D. Benedict,* for libelant.
*Wheeler & Souther,* for claimant.

BLATCHFORD, Justice. Each of the four bills of lading contains a provision that the claimant is not liable for injury to the goods occasioned by "the act of God, * * * effect of climate, or heat of holds." Also the following clause: "The company will not become liable for any value exceeding one hundred dollars ($100) upon each of the above-named packages, unless the value is declared at the time

of shipment, and so expressed in this bill of lading, and extra freight thereon paid, nor in any case for an amount exceeding the invoice cost thereof." Also, in the case of White, the following clause: "The goods to be taken from the ship's tackles, where the ship's responsibility shall cease, and to be taken along-side by the consignee, immediately the vessel is ready to discharge, or otherwise they will be landed by the master, and deposited at the expense of the consignee, and at his risk of fire, loss, or injury, in warehouse on the company's wharf, or sent to the public stores, as the authorities at the port of discharge shall direct, and, when deposited in the warehouse, to be subject to storage and other charges as customary;" and in the other three bills of lading, the last-named clause, changing the words "in warehouse" to the words "in the warehouse provided for that purpose," and omitting the words "and other charges as customary."

The district court decreed for the libelant. It held that December 29th was so cold a day as to render it impossible to land oranges without freezing them. The district judge said in his decision:

"The weather continued cold, indeed, below zero, until the following Monday. The steamer commenced to land oranges on the day of her arrival, and on that day and the following Thursday and Friday landed the whole consignment. The necessary consequence was that the libelant's oranges were frozen, and their value for the most part destroyed. Objection was made by the libelant to the landing of the oranges, because of the unsuitable weather."

He also held that the oranges were not injured by the "act of God," or the "effect of climate;" that the vessel was not "ready to discharge," when she could not make a proper discharge; that there was no necessity for landing the libelant's oranges when they were landed; that no duty required the destruction of the libelant's oranges for the purpose of landing the cargo of other persons; and that there was time before the vessel sailed for her to have landed the oranges in suitable weather, and to have taken in her outward cargo. There was a decree that the libelant recover his damages, with a reference to ascertain them. On this reference there was no proof as to the invoice value, but evidence only as to the sound market value of the oranges in New York at the time. The commissioner reported the damages to be the value of 1,230 barrels of oranges at $5 per barrel, and 163 barrels at $4.50 per barrel, less the charges for transportation by the claimant, being $6,883.50, less $1,099.49, amounting to $5,784.01, with interest from December 29, 1880. The claimant excepted to the report (1) because the damages had been fixed at the market value in New York, instead of an amount not exceeding the invoice cost; (2) because they had not been found at an amount not exceeding the invoice cost; (3) because there had not been credited against the damages such proportion thereof as the libelant might have prevented by efforts to preserve the oranges instead of abandoning them. The district judge made the following decision on the exceptions:

"The ship having landed the fruit without a permit, and also at a time when it was frozen as soon as landed, and this against the express objection of the consignee, the consignee had the right to decline to pay the freight and abandon the fruit, and hold the ship liable for its sound value, the same not only having been frozen, but also become forfeited to the government by reason of having been landed without a permit. The commissioner has reported the damages to be the sound value of the fruit, and in my opinion the report is correct. The exceptions are therefore overruled."

A decree was ordered for the libelant for $7,018.31 damages, and interest, and $215.65 costs. The claimant appealed. In this court an amended answer has been put in, and further proofs have been taken on both sides.

The claimant contends that the injury to the oranges was inevitable from the moment the hatches were uncovered and the ship broke bulk; that the claimant was justified in discharging the libelant's oranges, because he had obtained the delivery order and the permit, and given a check for the freight; and that this virtual order to discharge was not revoked till after the discharge had been commenced, and the cold air had got into the hold of the ship. The answer to this view is, that the preparations which the libelant made were only preparations to be ready to take his oranges when they could be safely discharged. They did not amount to a request to discharge the oranges in such weather. If a general ship carries, in winter, oranges, which cannot be safely discharged in freezing weather, and agrees to deliver them in good order, she takes the risk of such discharge, unless she protects herself against it by some provision in the bill of lading. Here there was no such provision. The freezing was not the "act of God" nor the "effect of climate," within the meaning of the bills of lading. The negligence of man exposed the oranges to be frozen. "Effect of climate," in the sentence "effect of climate, or heat of holds," means the effect of climate in the passage of the vessel from a tropical climate northward, or *vice versa*, during the voyage, in its action on cargo in the vessel, and not such exposure in landing as occurred in this case.

As to the amount of damages, the libel sets forth the shipments, and avers that thereupon "the agent of the vessel executed the bills of lading, to which the libelant begs leave to refer as part of this, his libel herein." The stipulation under which the bills of lading were put in evidence by the libelant, and which was itself put in evidence by the libelant, states that the four bills of lading were "duly issued and delivered" by the claimant, upon the shipments being made upon the vessel at Kingston, "as alleged in the article of the libel herein." In accepting each bill of lading the shipper accepted the terms of the contract it contained, and the libelant cannot now be heard to say that the shipper did not know its contents, or received it after the shipment, or that he, the libelant, did not know its contents, or that the clause as to invoice value has been waived in other cases. The provision that the claimant shall not be liable in any case for an amount exceeding the invoice cost of the oranges is distinct.

The libelant, under the circumstances, had no duty to take care of the oranges. As to him they stood as if they were still in the vessel, not discharged. They were wholly in the custody and at the risk of the vessel.

The libelant is entitled to recover the invoice cost, with interest, according to the findings, and his costs in the district court. The claimant is allowed its costs in this court.