THE STYRIA (four cases).

(Circuit Court of Appeals, Second Circuit.    April 3, 1900.)

Nos. 137–144.

**1. SHIPPING—EFFECT OF DECLARATION OF WAR—RIGHT TO DISCHARGE CONTRABAND CARGO.**

The Austrian steamship Styria loaded at an Italian port as a part of her cargo a quantity of sulphur for delivery at New York. The master issued bills of lading therefor, and on April 24, 1898, cleared; but, before sailing, war was declared between the United States and Spain. *Held*, that such fact constituted a "restraint of princes," within an exception in his bills of lading, which justified the master in refusing to proceed to a port of one of the belligerent powers with a cargo of sulphur, generally recognized and treated as contraband of war, and that he had the right to land such cargo, with all proper precautions for safe-keeping, at the shippers' expense, without waiting for further action of the hostile powers, thus leaving his vessel free to proceed with the remainder of her cargo; but, having learned, before he left the port, through official proclamation made by the Italian government, that the Spanish government had agreed not to treat sulphur as contraband of war until further notice, it became the duty of the master to reload the cargo so discharged, and the vessel was liable to the shippers for the damages sustained by reason of his failure to do so.

**2. SAME—LOSS BY DELAY IN DELIVERY OF CARGO—MEASURE OF DAMAGES.**

The measure of damages for delay in delivering a cargo of merchandise, for which the vessel is liable, is the difference between the price the goods actually brought when they arrived, and the price they would have brought at the time they should have been delivered; and this measure of damages is not changed by a stipulation in the bill of lading that the shipowner is not to be liable in any case for more than the invoiced or declared value of the goods, the purpose of which is only to fix the outside limit of liability.

Appeal from the District Court of the United States for the District of New York.

These causes come here upon appeals from decrees of the district court, Southern district of New York. There are four libels and cross libels, arising out of the same transaction. The libelants are all owners of different lots of brimstone, shipped by the steamship Styria at Porto Empedocle, Sicily, in the month of April, 1898, and, the vessel not having brought over the brimstone, libeled her upon her arrival for damages resulting from her failure to bring it in accordance with the contract. Subsequently, by stipulation between the parties, the brimstone was brought over by the Abbazia, another steamer belonging to the Austro-Americana Steamship Company, which is the owner of the Styria, and, upon its arrival here, was libeled by that company for expenses incurred in landing and storing in Sicily the brimstone in question. Decrees were entered in the district court in favor of the libelants and cross claimants (93 Fed. 474), from which decrees the claimants and cross libelants appealed. The libelants, being dissatisfied with the amount of damages awarded by the district court, appeal from so much of the decrees in their favor as limits their recovery to the amount actually awarded. The facts sufficiently appear in the opinion.

J. Parker Kirlin, for the Styria.

E. B. Hill, for appellants Malcolmson and Munroe.

Latham G. Reed, for appellant Parsons.

Charles C. Burlingham, for appellant Morgan.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The Styria is an Austrian steamer, owned by the Austro-Americana Steamship Company. She was bound on a voyage from Trieste, via Sicilian ports, to New York. She sailed from Trieste with some general cargo for New York on April 16, 1898, reached Cape Empedocle (Girgenti), her second port, early on April 21st, and began taking on brimstone on the afternoon of the same day. Five shippers at that place furnished for shipment about 2,200 tons, the cargo here involved, which was laden on the vessel by April 24th, on which day the vessel was cleared at the custom house and was ready to proceed on her voyage. The captain was under instructions to proceed to Messina and Palermo to fill up with fruits. Fruit cargo at these ports had been engaged. About this time war broke out between this country and Spain. There is no dispute as to the sequence of historical events, which is as follows: On April 20th congress passed and the president approved the joint resolution recognizing the freedom and independence of the people of Cuba, and demanding that the government of Spain relinquish its authority in the island and withdraw its land and naval forces. On the same day the Spanish minister at Washington demanded and received his passports. On the morning of April 21st our minister at Madrid was informed by the Spanish minister of foreign affairs that the diplomatic relations between the two governments were broken off. On the same day he left Madrid. On April 23d the queen regent of Spain issued a decree announcing the existence of war with the United States, which was published in the official papers at Madrid on April 24th, and communicated to the other powers and made public on or about April 25th. On that day it was published in the newspapers of this country, and presumably in Sicily and England. The declaration of war was made by the United States under an act passed April 25th, declaring the existence of war since April 21st. There is no evidence in the case which will warrant a finding that the captain knew that war had been declared before he shipped libelants' sulphur and signed bills of lading therefor. On April 25th the queen regent of Spain issued a proclamation, which contained the following provisions:

"Art. 5. In order to capture the enemy's ships, to confiscate the enemy's merchandise under their own flag, and contraband of war under any flag, the royal navy, auxiliary cruisers, and privateers, if and when the latter are authorized, will exercise the right of visit on the high seas and in the territorial waters of the enemy, in accordance with international law and any regulations which may be published for the purpose.

"Art. 6. Under the denomination 'contraband of war' the following articles are included: Cannons, machine guns, * * * powder, sulphur, saltpeter," etc.

Thereafter, and while the state of war continued unmodified, under the rules of international law, sulphur or brimstone, shipped and owned as this was, was subject to seizure by war vessels of Spain on the high seas, a process which would involve the arrest of the neutral vessel carrying it wherever she might be,—off the coast of Sicily, in the straits of Gibraltar, or on the banks of Newfoundland,—her enforced deviation from her voyage to a Spanish

port, and her detention there until a Spanish prize court should have determined the questions arising upon confiscation of the cargo. It appears from the record that on April 27th the captain knew that Spain and the United States were at war. On that day he began to discharge and warehouse the sulphur, notifying the shippers that he did so "on finding risky my passage to New York, with the actual sulphur cargo, for facts of war." The unloading of the sulphur was completed on May 7th, and shippers again notified. On the same day she cleared, and on the next morning, May 8th, proceeded on her voyage with the cargo laden at Trieste, picked up her fruit at Messina and Palermo, and sailed from Italian waters May 9th, reaching New York on June 3d.

It seems manifest that, upon the outbreak of war, a voyage with contraband on board to the port of one of the belligerents might fairly be regarded as a risky piece of business. The suggestion made upon the argument that the naval power of Spain was not such as would induce a "man of ordinary courage, judgment, and experience" to hesitate to proceed is of no weight. We may not attribute to the captain of the Styria knowledge gained after the event; and, indeed, this court is not advised of any historical facts which would warrant the conclusion that it was not entirely within the power of Spain during the first few months of the war to arrest and search every vessel westward bound through the straits of Gibraltar, and picking her way along by the lighthouses on the Spanish coast. The first question to be determined is whether, with such a risk involved in the event of the vessel's proceeding with the sulphur on board, the captain was justified in relanding and warehousing it. Three clauses of the bill of lading are relied upon:

(a) "Restraints of princes and rulers of people * * * excepted."

(b) "In case of blockade or interdict of the port of discharge, or if, without such blockade or interdict, the master shall consider it unsafe for any reason to enter or discharge cargo there, he is to have option of landing the goods at any other port which he may consider safe at shipper's risk and expense, and, on the goods being placed in charge of any mercantile agent or of British consul, and a letter being put into the post office, addressed to the shipper and consignee, if named, stating the landing and with whom deposited, the goods to be at the shipper's risk and expense, and the master and owners discharged from all responsibility."

(c) "With liberty (in event of steamer putting back to this or into any other port, or otherwise being prevented from any cause from commencing or proceeding in the ordinary course of her voyage) to ship or transship the goods by any other steamer."

The second clause above quoted was made most prominent upon the argument,—question being raised whether it was applicable to a condition of affairs existing elsewhere than at the port of discharge, and also whether, as matter of fact, the master exercised the option provided for, and whether he did himself consider the voyage unsafe; there being evidence tending to show that he landed the sulphur because of telegraphic orders from the steamer's managers in Glasgow. We do not find it necessary to discuss this branch of the case because we find in clause (a) abundant authority for a refusal to carry forward the sulphur while such a condition of affairs existed as that already described as being generally known to

exist when the discharge began on April 27th. There is no logical difference between a restraint of princes and rulers exercised by a cruiser with power to visit, search, and seize lying two leagues off Cape Empedocle, and that exercised by a half-dozen cruisers patrolling a narrow strait through which, if the voyage be made, the vessel must pass. Under such circumstances the owner of contraband cargo (loaded, as this was, before war broke out) could with reason insist that it would be gross negligence on the part of the ship to bring his cargo forward. Moreover, it would certainly be unreasonable to require the ship to remain in port with the contraband cargo on board until the war should cease,—a period of months, possibly years. The owners of other cargo not contraband have rights as much, if not more, entitled to consideration than those of the owners who have been unfortunate enough to ship the cargo which has produced the risk.

That a blockade is within the term "restraints of rulers and princes" has been settled for the federal courts by the decision in Olivera v. Insurance Co., 3 Wheat. 183, 4 L. Ed. 365. That a well-founded apprehension of capture by the cruisers of a belligerent is the equivalent of an actual restraint is the doctrine of the later authorities. The case of Atkinson v. Ritchie, 10 East, 530, mainly relied on by libelants, is not in point. The only excuse there offered was that the captain apprehended an embargo would be laid, but in the case at bar he knew that war had been declared.

In Geipel v. Smith, L. R. 7 Q. B. 410, Cockburn, C. J., says:

"Is a blockade a restraint of princes? I think it is. * * * provided the blockade is effective; and in the eye of the law a blockade is effective if the enemy's ships are in such numbers and position as to render the running of the blockade a matter of danger, although some vessels may succeed in getting through. * * * It would be monstrous to say that in such a case the parties must wait, for the obligation must be mutual, till the restraint be taken off,—the shipper with cargo which might be perishable, or its market value destroyed; the shipowner with his ship lying idle, possibly rotting."

In Rodoconachi v. Elliott, L. R. 9 C. P. 518, the exchequer chamber held to the same effect where goods in transit from China to England had reached Paris just at the beginning of its siege by the Germans, and it appeared that an effort to remove them would probably have resulted in their seizure.

In Explosives Co. v. Jenkins [1896] 2 Q. B. 326, goods, contraband in the event of war, were shipped from England to Yokohama. While on the high seas war broke out between China and Japan, of which the master heard when he put into Hong Kong, whereupon he discharged the goods, and placed them in safe custody, and continued his voyage to Yokohama. The court sustained the ship, saying:

"The goods were as effectually stopped at Hong Kong as if there had been an express order from the Chinese government that contraband of war should be landed."

Inasmuch as the master, where the contract was made in time of peace, could properly decline to carry forward a cargo which by the subsequent breaking out of war had become contraband, we fail to

see why he should not have the right to land such contraband cargo, with all proper precautions as to safe-keeping, thus leaving his ship free to discharge its obligations to innocent cargo without risk or delay by reason of an actual arrest which would be caused only by the presence of such contraband cargo. The ship made no contract to carry contraband of war to the port of a belligerent, and should not be held to the obligations of a contract into which she has never entered. We understand that the district court reached this same conclusion, but found the ship in fault because she did not wait a reasonable period to see if there might not be some reasonable assurance of safety, and held that "the commencement of the discharge on the 27th was too hasty and precipitate."

This brings us to the next branch of the case. When two nations formally proclaim the existence of a state of war between themselves with all the solemnity observed in this instance, it would seem to be going too far to say that parties whose contracts are affected thereby should wait some indefinite time, which a court shall find reasonable, in a vague expectation that the belligerents may think better of it, and make peace. A situation is quite conceivable where delay might fairly be required. Thus the minister of one power or the other might demand his passports; or the day named in an ultimatum might pass without compliance with its requirements; or a squadron of the war vessels of one power might impress seamen from the deck of the war vessel of another power, as the Carnatic and her consorts did with the Baltimore in 1798; or the war vessel of one power, encountering the war vessel of another upon the high seas, might pour broadside after broadside into her, as the Leopard did with the Chesapeake in 1807,—any one of which acts would seem to import the imminence, if not the actual existence, of war, and yet might fall short of being such authoritative evidence of a state of belligerency as would justify a master in treating any part of his cargo as being thereby made contraband. But the situation shown here was a very different one. Both nations had united in proclaiming to the whole world that they were at war, and we know of no reason why the master of any vessel of a neutral nation was bound to wait 24 hours, or 24 days, or 24 weeks, to see if the two belligerents would not settle their differences. As soon as he learned that war was declared, the master knew that the cargo he had taken on board at Port Empedocle was contraband. "I knew," says he, "that sulphur is to make gunpowder. Everybody knows that. * * * I thought it must be contraband." We should have some doubts as to the efficiency of a master for international commerce who did not know that sulphur was contraband of war. It certainly should be a safe assumption for the master of a neutral vessel to make that he cannot carry such cargo to the ports of one belligerent without risking its seizure by the other; and, in the absence of special circumstances, there would seem to be no necessity to wait for further assurance in that regard.

In the case at bar, however, there were special circumstances which will be next considered. The exportation of sulphur is one of the greatest industries of the island of Sicily, and the Italian gov-

ernment was naturally solicitous that the trade in sulphur with the United States should not be interfered with. It now appears in the record, by reports obtained from diplomatic sources, that shortly after the proclamation of the queen regent negotiations were opened by the Italian government to secure a modification of its provisions, so that sulphur should not be considered contraband of war. The Spanish government declined to alter the decree, but on April 29th, at Madrid, the Spanish minister for foreign affairs "verbally" [sic, orally?] stated to the Italian ambassador that orders would be given to the naval departments, as a temporary measure, not to treat sulphur as contraband of war. The same statement was made by the Spanish minister for foreign affairs to the British ambassador on May 6th. On May 31st the same minister stated in an official note to both the Italian and the British ambassadors that the treatment by Spain of sulphur as contraband of war would be temporarily suspended, and that the order which had been given to that effect would not be revoked without due notice. Not being in telephonic communication with the chancellery of the embassy at Madrid, the master of the Styria was not advised of these transactions at the moment they occurred; and his conduct is to be judged, not in the light of exact knowledge acquired after the event, but by such information as may have been available for him at the time and place.

As we have seen, he knew certainly on April 27th, and probably on April 26th, that war had been declared, and that his sulphur cargo was contraband; that he was therefore entitled to land and store it, thus leaving his ship free to carry out her obligations to the rest of the cargo. On May 25th the Giornale di Sicilia, a newspaper published at Palermo, and which the captain saw from day to day, stated that Messina merchants had asked their parliamentary deputy to urge the government to co-operate to exclude brimstone from being considered contraband. From day to day thereafter the paper was filled with reports and rumors as to the progress of this movement to secure exemption; but down to the 6th of May not one of these reports bore the stamp of authority, and no one vouched for their accuracy. The statements in the clippings from the newspaper which have been printed in the record are merely the expression of the beliefs and expectations of its correspondents, in Rome or elsewhere, furnishing copy to a paper published in a community where an intense interest was felt in having sulphur exempted. There was no reason why it should be exempted. It is a variety of merchandise such as always has been contraband. Its exportation to the United States might well be considered an "aid" to Spain's enemy. No one appears to have suggested that the United States concede the same exemption. On the one hand it might be urged that it would please the government and people of Italy to grant the request; but, on the other hand, in the case of merchandise so highly contraband, neither the Italian government nor people could justly take offense if Spain should insist on exercising the rights which international law accords to every belligerent. Enlightened by the information now made known, we can

see that the hopeful prognostications of the writers for the Journal of Sicily were well founded; but there was nothing to give any such assurance at the time they appeared. We should hesitate to hold that it was the duty of a master under similar circumstances to delay action on the expectation that a belligerent would voluntarily abandon one of its weapons, on no better assurance that such action would be taken than the statements of anonymous and irresponsible contributors to a newspaper published in a community which is extremely solicitous that such action be taken. By May 6th, however, the situation changed. The Journal of Sicily published an official declaration from the Italian minister of agriculture, industry, and commerce, as follows:

"Chamber of Commerce, Palermo: I inform the Chamber of Commerce, for the useful information of merchants, that by the decree of April 23d of the Spanish government are considered as contraband of war arms, projectiles, fuses, powder, sulphur, niter. * * * I would also state that, in consequence of our request, the Spanish government has given notice to the commanders of its vessels to let sulphur pass free.

"[Signed]                              The Minister, Coeco-Ortu."

Here was an official declaration which the master should have accepted as sufficient. The Italian government, through a cabinet minister, announces that official action has been taken by the Spanish government the practical result of which was to make sulphur free from capture. It matters not that the Spanish government might thereafter reconsider this decision, and direct its cruisers to seize sulphur, because it was to be assumed that cargoes taken out in reliance upon the proclamation of the Italian government would be respected. If they were not, the Italian government would have good ground for claiming indemnity from Spain, and a casus belli in case of its refusal.

It is not quite clear on what day this proclamation was published in the Journal of Sicily. Each issue of that newspaper has a double date, and the issue containing it is dated "Thursday–Friday, 5th–6th May, 1898." The sulphur was not wholly discharged until May 7th. Even if it had been discharged earlier, however, this proclamation appearing before the steamer sailed upon her voyage, we are clearly of the opinion that it was the master's duty to reship it, since the condition of affairs which made it contraband had ceased to exist. The loss sustained by reason of the expense of discharging and reloading so much of the sulphur as had been discharged before the changed condition was officially made known should be borne by the cargo owner. It was his misfortune that, after he had put it aboard, a war broke out which made his cargo contraband, and relieved the ship from the obligation to carry it while it remained in that condition. The ship, however, is liable for any loss sustained in consequence of her failure to carry and deliver when she could do so safely. There was no loss or deterioration of the sulphur, but there was a loss of market. The value of sulphur on the day it would have reached this market, had it been reshipped and brought forward when the Italian proclamation was published, was greatly in excess of its value when it finally reached here. The measure of damages in such cases is well settled.

The loss is the difference between the price the goods actually brought and the price they would have brought had they been sold on the day when they should have arrived.

The only remaining question in the case is whether this method of calculation is modified by the express terms of the contract. The bill of lading contains the following clause:

"The shipowner is not to be liable for any damage to any goods which are capable of being covered by insurance, nor for any claim notice of which is not given before the removal of the goods, nor for claim for damage or detention of goods under through bill of lading, where the damage is done or detention occurs while the goods are not in possession of the shipowner, nor in any case for more than the invoice or declared value of the goods, whichever shall be the least."

The district judge construed this as providing that, in any settlement of loss or damage, the invoice value, and not the actual value, of the goods, should be taken as a basis, and therefore found the damage from loss of market to be the difference between such invoice value and the price the sulphur actually brought. A similar clause has been so interpreted in the same district in The Hadji (D. C.) 18 Fed. 459, and Pearse v. Steamship Co. (D. C.) 24 Fed. 285, and in the district of New Jersey in The Lydian Monarch (D. C.) 23 Fed. 298. The Hadji was appealed (C. C.; 20 Fed. 875), but the point was not passed upon in the circuit court. In the brief of counsel for claimant there is cited The Aline, 23 Blatchf. 335, Fed. Cas. No. 6,991; but it does not sustain the proposition. We are unable to concur in the interpretation put upon this clause, for the reason that the language used does not seem to import any such idea. The statement that the shipowner shall not be liable in any case for more than the invoice value of the goods is a simple and straightforward one. Grammatically construed, it fixes a final limit of liability beyond which he shall not be required to respond. It does not profess to regulate the calculation by which a loss is to be ascertained, if such loss is less than the limit. To give them such a meaning would seem to be to substitute for the contract the parties have made another and different one, which they might easily have made for themselves had they wished to do so. Of a precisely similar clause the supreme court of Massachusetts said:

"The words 'the liability shall not exceed,' etc., are apt words to express the outside limit of the sum to be recovered; but both the particular words and the whole structure of the sentence are most inapt to express a stipulation that, if the goods are still equal to the invoice value, there shall be no recovery at all." Brown v. Steamship Co., 147 Mass. 60, 16 N. E. 717.

The decree of the district court is therefore reversed, and the cause remanded, with instructions to decree in favor of libelants for the difference between the proceeds of the sale (less charges of sale) and what would have been the proceeds (less charges of sale) of a similar sale on the day on which the sulphur could have been sold, had it been promptly reshipped and brought to this market, less the freight, against which sum there is to be credited the proper expenses of discharging and reshipping at Cape Empedocle as above indicated, and claimed in the cross libels. Interest will go with the balance; and, since both libelants and cross libelants have prevailed, there should

be no costs. In this court, each side having prevailed in part, there will be no costs.

## On Reargument.

### (May 10, 1900.)

Reargument of this cause was had upon the single question as to the effect of the stipulation under which the sulphur was brought forward. In the former opinion we held the ship in fault, and bound to respond for the damages caused by loss of market; and that loss was declared to be the difference between the price the goods actually brought when they reached here, in another steamer of claimant's line, and the price they would have brought had they been sold on the day when they should have arrived. That difference is concededly less than the invoice value. The reargument has induced no change of opinion on these propositions. We fail to see that it makes any difference how the sulphur was brought forward. If the claimant failed to bring it, the owner could have withdrawn it from the Sicilian warehouse, paying the Styria's lien for expenses of discharge and the freight, and brought it forward himself; or he might, if he chose, have sold it in Sicily. It is certainly clear that, at the time the stipulation was signed, claimant could not have seized the sulphur and sold it for its own use,—a deliberate act of conversion,—and in the face of such willful tort have still insisted on the limitation of liability clause contained in the bill of lading. Such being the situation, and the libelants being in a position where by application of the rule as to measure of damage above set forth they would be made whole—and only be made whole— for the loss they suffered by the ship's negligence, the claimant being at the same time protected against any liability in excess of the stipulated limit, it is contended that the effect of the stipulation is practically to destroy the libelants' right to relief; so that, although concededly they have lost over $20,000 through the ship's misconduct, they cannot recover anything, while by the same stipulation the ship gives up nothing. When the circumstances under which the stipulation was signed are taken into consideration, it appears that its language does not import such a one-sided agreement. The libels had been filed, all claiming damages for nondelivered sulphur at its full market value on the day it should have reached here. No answers had yet been interposed, nor claim made that the damages must be scaled down to the invoice value. When, therefore, the stipulation provided that the proceeds of the sulphur to be brought forward under its terms should be credited on account of the damages, it certainly was not intended that it should be credited twice,—once by the application of the rule for determining difference of market values, and again by deducting the amount of such proceeds from the balance found upon applying the rule for ascertaining damages which the transactions and documents required. The petition to modify the mandate is denied.