BRITISH WEST INDIES PRODUCE,
INC., Plaintiff,

v.

S/S ATLANTIC CLIPPER, her engines,
etc., her owners, Bernhard Warrins of
Carolinensiel, West Germany, Defend-
ants.

ATLANTIC LINES, LTD., Defendant and
Third-Party Plaintiff,

v.

BAY RIDGE OPERATING COMPANY,
Third-Party Defendant.

No. 68 Civil 4966.

United States District Court,
S. D. New York.

Jan. 8, 1973.

**550**

Bernstein, Weiss, Parter, Coplan & Weinstein, New York City, for plaintiff; Charles W. Lake, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant S/S Atlantic Clipper; Richard E. Repetto, New York City, of counsel.

Mendes & Mount, New York City, for defendant and third party plaintiff Atlantic Lines Ltd.; John J. Sullivan, New York City, of counsel.

McHugh, Heckman, Smith & Leonard, New York City, for third party defendant Bay Ridge Operating Co.; James M. Kenny, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff British West Indies Produce Inc., the consignee of two shipments of yams, ginger and pumpkins, commenced this action in admiralty under 28 U.S.C., section 1333, to recover damages for the loss of cargo due to exposure to freezing weather. Three thousand crates of yams were taken on board the S/S Atlantic Clipper at Bridgetown, Barbados, West Indies, on November 27, 1968 (Bill of Lading No. 1) and 200 crates of yams, 500 sacks of pumpkins and forty crates of ginger at Kingstown, St. Vincent, West Indies, on December 2, 1968 (Bill of Lading No. 2), for delivery to New York City.

The defendants are the vessel, the S/S Atlantic Clipper, sued in rem, and its time charterer, Atlantic Lines Ltd., which issued the bills of lading.[1] The evidence establishes that the shipments were loaded aboard the vessel in good order and condition and arrived in New York City in that condition. In the instance of the Barbados shipment there was direct evidence; in the instance of the St. Vincent shipment, the finding hereafter made that following outturn and upon initial inspection it was found in sound condition permits an inference that the cargo was so received by the carrier when it issued the bill of lading.[2] Liability, or exoneration from liability, centers about the unloading and delivery of the cargo in New York City.

Since the major portion of plaintiff's damage claim is based upon the alleged negligent discharge of the cargo to an unheated and unprotected pier controlled by Atlantic Lines Ltd., liability is governed by the Harter Act,[3] which is applied "to the period between the discharge of cargo from the vessel and its proper delivery."[4] As to the re-

---

1. Atlantic Lines Ltd., as third-party plaintiff, sued Bay Ridge Operating Company, the stevedore engaged by it to unload the vessel, as third-party defendant. The court dismissed the action against Bay Ridge Operating Company on the basis of the defense of general release.

2. Cf. Elia Salzman Tobacco Co. v. S. S. Mormacwind, 371 F.2d 537, 539 and n. 2 (2d Cir. 1967); Continental Grain Co. v. American Commercial Barge Line Co., 332 F.2d 26 (7th Cir. 1964); Mississippi Valley Barge Line Co. v. Inland Water-ways Shippers Ass'n, 289 F.2d 374, 378 (8th Cir.), cert. denied, 368 U.S. 876, 82 S.Ct. 123, 7 L.Ed.2d 77 (1961); The Glasgow Maru, 102 F.2d 450 (2d Cir.), modified on other grounds, 103 F.2d 430 (1939); McNeely & Price Co. v. The Exchequer, 100 F.Supp. 343 (E.D.Pa.1951); The Pocone, 91 F.Supp. 961 (E.D.N.Y. 1950).

3. 46 U.S.C. §§ 190, 191.

4. Caterpillar Overseas, S. A. v. S. S. Expeditor, 318 F.2d 720, 723 (2d Cir.), cert.

mainder of the cargo, where plaintiff's claim for damages is directed toward that portion of the cargo which was in the hold of the vessel, the Carriage of Goods by Sea Act[5] governs the rights of the parties.[6]

The yam is a tropical root vegetable, somewhat like a potato but higher in starch content and with a nutty taste; it is edible when preserved at a temperature of 70 degrees, but if exposed to extreme cold or a chilling temperature, decomposition is inevitable, with manifestation of damage depending upon when it is brought up to a higher temperature. A pulp temperature[7] above 50 degrees is considered safe. Once chilling sets in, the yam's cellular structure breaks down, allowing bacteria to enter, causing rot to set in, followed in time by a complete decomposition; the lower the temperature, the faster the deterioration. Similarly, pumpkins and ginger also decay if subjected to chilling or freezing weather, but their decomposition is slower than in the instance of the yams.

The cargo, from time of delivery to the vessel until its arrival in New York, was not subjected to any chilling or freezing weather or damage. The vessel docked at a pier at the East River on the afternoon of December 11, 1968. The air temperature in New York City that day was below freezing, from 30 degrees at 1 p. m., and between 31 and 33 degrees up to midnight. Plaintiff's president, aware of the perishable nature of the shipment, communicated with the local agents of Atlantic Lines Ltd. and was told that the vessel would arrive early that afternoon, and to be in readiness to take delivery upon discharge. However, the lines of communication between the charterer's agents and its pier superintendent were not in harmony, with the latter insisting that he had the final say of when delivery to consignee would be made. Although plaintiff had trucks ready to take delivery of the shipment even before arrival of the ship and during unloading of the vessel, the pier superintendent decided that delivery of the cargo to plaintiff would not be made that evening.

Unloading began at about 5:30 p. m. and continued until 9 p. m.; during this period about 2800 crates of yams, almost the entire Barbados shipment, were unloaded and piled in tiers in an unheated shed, unprotected from the elements; the only protection attempted was placing tarpaulins over the cargo, but these covered only the top crates; the sides of all the other crates were exposed to the freezing weather, which continued through the early hours of December 12. The balance of the Barbados shipment was discharged on December 12 from 8 a. m. to 10 a. m. The air temperature

denied, American Export Lines, Inc. v. Caterpillar Overseas, S. A., 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963).

5. 46 U.S.C. §§ 1300–1315.

6. The parties seemingly disagree as to the applicability of the Harter Act, defendant Atlantic Lines Ltd. claiming that the bills of lading make COGSA applicable after the goods have been discharged. While this may be true, it does not necessarily result in displacement of the Harter Act. See Mackey v. United States, 83 F.Supp. 14 (S.D.N.Y.1948), aff'd, 197 F.2d 241 (2d Cir. 1952); cf. R. L. Pritchard & Co. v. S. S. Hellenic Laurel, 342 F.Supp. 388, 391 (S.D.N.Y.1972); Zifferer v. Atlantic Lines, Ltd., 278 F.Supp. 736 (D.P.R. 1968). But cf. United States v. Central Gulf S. S. Corp., 340 F.Supp. 473, 479 n. 2 (E.D.La.1972). In end result, however, since negligent delivery to an unfit pier at point of discharge is charged, it matters not which Act governs. As the noted admiralty authors have observed: "[E]xcept for unimportant differences in phraseology, the two Acts come down to much the same thing, as to liabilities which might be incurred before loading or after unloading." G. Gilmore & C. Black, The Law of Admiralty 127 (1957). See also Scarburgh v. Compania Sud-Americana De Vapores, 174 F.2d 423 (2d Cir. 1949); Mamiye Bros. v. Barber S. S. Lines, 241 F.Supp. 99, 107 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

7. The pulp temperature is obtained by injection of a thermometer into the yam to get its inside temperature.

of the pier during this period ranged from 30 to 33 degrees. That morning plaintiff's president and an inspector for the United States Department of Agriculture examined the discharged cargo. They found it in a firm, sound and excellent condition without decay. However, the pulp temperatures of the Barbados crates of yams ranged from 33 degrees to 38 degrees Fahrenheit; the St. Vincent yams ranged from 35 degrees to 41 degrees; the ginger ranged from 30 degrees to 31 degrees; and the pumpkins from 33 degrees to 41 degrees.

The cargo had to be fumigated under requirements of the United States Department of Agriculture at temperatures in excess of 70 degrees before they would be admitted into the country. On December 12, following inspection of the cargo at the pier, all of the yams, except 50 crates, were removed to warehouses for that purpose; the following day the balance of the yams and the pumpkins and ginger were also taken to warehouses. The yams were inspected following their fumigation. On December 19, a cargo surveyor for the vessel found the yams a total loss.[8] The next day, an inspector for the Department of Agriculture found, in the case of the Barbados yams, an average of 54% soft rot, remainder of stock firm; in the case of the St. Vincent yams, 100% soft rot. Plaintiff attempted to salvage the sound yams following fumigation, but the process of sorting and repacking was so difficult as to render it economically unfeasible. On January 13, 1969, the Department of Agriculture supervised the dumping of 2,960 crates of yams, which at that time were 100% decayed; the balance of the yams were a total loss. Similarly, the pumpkins and ginger decomposed and were of no commercial value. There can be no doubt that the decay and decomposition of the shipments were the direct result of the reduction of the pulp temperatures below the safe optimum.

The carrier, acting through the pier superintendent, having decided to commence unloading the cargo on December 11, was under a duty to place the discharged portion upon a fit pier in order to effect a proper delivery.[9] This it failed to do. Atlantic Lines Ltd. was negligent in placing almost the entire shipment of the Barbados yams on the exposed and unheated pier in cold and freezing weather without adequate protection; in failing to supply emergency or temporary heating to protect the perishable cargo stored there from freezing; and in failing to exercise the diligence required of it by exposing the cargo that remained on the vessel to cold and freezing weather for approximately four hours while the hatches were open and without adequate protection. The defendant's negligent conduct was the cause of the freezing of the cargo and its ultimate decomposition and loss. The pier superintendent, as well as other agents or representatives of Atlantic Lines Ltd. knew that the yams had to be protected against cold weather and that it was, as the superintendent himself termed it, a "perishable" and "sensitive" cargo.

Atlantic Lines Ltd.'s plea for exoneration from liability upon contentions (1) that the damage was unavoidable, and (2) that immediate discharge of the cargo was compelled and prompt delivery could not be made to the plaintiff because of an impending longshoremen's strike, is without substance. The first contention that the loss was unavoidable rests upon the prevailing weather conditions—Atlantic urges that the damage to the yams was not caused by their dis-

8. The same inspector later found the pumpkins to be in a state of "complete collapse," with fewer than 5% appearing to be sound.

9. Levatino Co. v. American President Lines, Ltd., 337 F.2d 729 (2d Cir. 1964); Caterpillar Overseas, S. A. v. S. S. Expeditor, 318 F.2d 720, 723 (2d Cir.), cert. denied, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); see The Eddy, 72 U.S. (5 Wall.) 481, 495, 18 L.Ed. 486 (1866); The Titania, 131 F. 229, 230 (2d Cir. 1904).

charge to the pier on December 11, but was the "inevitable result of discharging in cold weather." The essence of this argument is that during the four hours the hatches were open to discharge crates of yams, the yams, pumpkins and ginger would rapidly cool off from their original temperature and reach a pulp temperature lower than the optimum considered safe for them; hence this would be an unavoidable result of the discharge in the cold weather. This rather facile argument overlooks the carrier's duty with respect to the cargo in the hold as well as to that on the pier following discharge. Atlantic's duty with respect thereto was governed by COGSA and required it as carrier to "properly and carefully . . . keep, care for, and discharge the goods carried." [10] The prevailing weather conditions did not prevent the carrier from "properly and carefully" keeping, caring for and discharging the goods. Once it was decided to commence discharge of the cargo, obviously the hatches had to be open to carry on the operation. But in discharging from 5:30 p. m. to 9 p. m. the defendant's pier superintendent and its other agents, aware of the freezing weather and its deteriorating impact upon the yams that remained in the hold while the unloading operation was in effect, took no steps to protect that cargo by temporary heaters or other readily available means. It negligently failed in its duty properly to keep, care for and discharge the goods. It was the defend-

ant's act, or its failure to act that caused the damage; it was not inevitable; it was not an act of God.[11] "An act of God will insulate a carrier from liability only if there is no contributing human negligence." [12] Here there was such negligence. The contention that "damage to the cargo, under the weather conditions then prevailing, was inevitable" is not new; it was firmly rejected many years ago with the observation that "[i]f a general ship carries, in winter, oranges, which cannot be safely discharged in freezing weather, and agrees to deliver them in good order, she takes the risk of such discharge . . . . ." [13]

As to its second plea of exoneration from liability, defendant Atlantic Lines Ltd. relies upon section 4 of COGSA,[14] which in pertinent part provides that a carrier or ship shall not be liable for damage resulting from "(j) [s]trikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general: *Provided,* That nothing herein contained shall be construed to relieve a carrier from responsibility for the carrier's own acts . . . . ." However, the sought-for exoneration is without factual substance. There was then no strike or lockout; there was no restraint of labor. A threatened or impending strike, or labor negotiations, with the usual problems, afford no excuse for a carrier not taking reasonable and proper steps to comply with its duty of safekeeping the cargo.[15]

---

10. 46 U.S.C. § 1303(2).

11. *See* The Aline, 19 F. 875 (E.D.N.Y. 1883), aff'd, 25 F. 562 (C.C.E.D.N.Y. 1885), appeal dismissed, 136 U.S. 653, 10 S.Ct. 1075, 34 L.Ed. 559 (1889).

12. Levatino Co. v. American President Lines, Ltd., 337 F.2d 729 (2d Cir. 1964). *See* Mamiye Bros. v. Barber S. S. Lines, Inc., 241 F.Supp. 99, 107, 110 (S.D. N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966) ; *see also* World Prods., Inc. v. Central Freight Serv., Inc., 222 F.Supp. 849 (D.N.J.1963), modified on other grounds, 342 F.2d 290 (3d Cir. 1965).

13. The Aline, 25 F. 562, 568 (C.C.E.D. N.Y.1885), cert. denied, 136 U.S. 653, 10 S.Ct. 1075, 34 L.Ed. 559 (1889).

14. 46 U.S.C. § 1304(2)(j).

15. In fact, a Taft-Hartley injunction was in effect, which did not expire until December 20, some 9 days after defendant Atlantic Lines Ltd. commenced discharge of the cargo. The court's research failed to uncover any case where exoneration was granted solely upon the basis of an impending strike. In The Maui, 113 F.2d 1018 (9th Cir.), cert. denied, 311 U.S. 709, 61 S.Ct. 317, 85 L.Ed. 461 (1940), the damage may have arisen as much from the delay due to the actual

Again, in this instance, aware of the extreme cold weather, and its inevitable and damaging effect upon the cargo, the defendant exposed the portion that remained in the hold to the freezing weather without adequate protection just as it did to the outturned cargo on the unheated pier. This negligent conduct had nothing to do with a strike some ten days away. That the stevedores may have refused to work on the cargo does not excuse the defendant's failure to protect the cargo. Accordingly, Atlantic Lines Ltd. is held liable for the cargo damage sustained by plaintiff.

A final issue remains. Plaintiff seeks to hold the vessel liable in rem for the damage to the shipments. The resolution of this issue is made more difficult by the "sparsity of reported decisions considering this aspect of maritime law."[16] In addition, the parties do not cite, nor did independent research yield, any prior case which exactly parallels the circumstances in the one at bar. While the issue is close, the more compelling conclusion is that defendant S/S Atlantic Clipper is liable in rem for the losses sustained by plaintiff.

A lien against a vessel for cargo damage "is based upon an implied hypothecation of the ship to secure the performance of the contract of affreightment, once the cargo is aboard."[17] In this case, the contract has not been performed satisfactorily, and regardless of which party bears the ultimate burden, the vessel is also liable to the consignee for the cargo damage. That the vessel was operated under a charter to Atlantic Lines Ltd. does not affect the liability of the vessel; and neither is it of consequence that the master did not sign the bills of lading. Once the S/S Atlantic Clipper sailed with the consignee's cargo aboard, it constituted ratification of the bills of lading.[18] Various courts have held the vessel liable in rem notwithstanding: (1) the shipowner was not found liable in personam;[19] (2) the damage occurred after the vessel had reached the port of delivery, i. e., during discharge;[20] (3) the damage resulted

strike as from the difficulties which were caused by the pendency of that strike. Defendant Atlantic Lines, Ltd.'s reliance upon The Toronto, 174 F. 632 (2d Cir. 1909), is misplaced since the strike in that case was already in progress when the damage occurred. In addition, a threatened strike, as well as one in progress, cannot excuse this defendant where, as here, no showing has been made that it prevented the defendant from taking proper care of the cargo. *See* Schroeder Bros. v. The Saturnia, 226 F. 2d 147, 149–150 (2d Cir. 1955) ; General Foods Corp. v. United States, 104 F.Supp. 629, 631 (S.D.N.Y.1952) ; *cf.* Badhwar v. Colorado Fuel & Iron Corp., 245 F.2d 903, 907 (2d Cir.) (Hand, J., dissenting), cert. denied, 355 U.S. 862, 78 S.Ct. 95, 2 L.Ed.2d 68 (1957).

16. Tube Prods. of India v. S. S. Rio Grande, 334 F.Supp. 1039, 1040 (S.D. N.Y.1971).

17. Pioneer Import Corp. v. The Lafcomo, 49 F.Supp. 559, 562 (S.D.N.Y.), aff'd, 138 F.2d 907 (2d Cir. 1943), cert. denied, 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063 (1944). *See* Krauss Bros. Lumber Co. v. Dimon S. S. Corp., 290 U.S. 117, 121–122, 123–124, 54 S.Ct. 105, 78 L.Ed. 216 (1933) ; Vandewater v. Mills, 60 U.S. (19 How.) 82, 90, 15 L.Ed. 554 (1856). Gilmore and Black state the principle broadly : "Every valid claim for cargo loss or damage creates a maritime lien against the ship." Gilmore & Black, *supra* note 6, at 165. *Accord,* Demsey & Associates v. S. S. Sea Star, 461 F.2d 1009, 1014 (2d Cir. 1972).

18. Demsey & Associates v. S. S. Sea Star, 461 F.2d 1009, 1015 (2d Cir. 1972) ; Pioneer Import Corp. v. The Lafcomo, 138 F.2d 907 (2d Cir. 1943), cert. denied, 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063 (1944) ; *see* The Blandon, 287 F. 722, 723–724 (S.D.N.Y.1922) (Hand, J.) ; Gilmore & Black, *supra* note 6, at 208.

19. United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D.N.Y. 1965) ; The Poznan, 276 F. 418 (S.D. N.Y.1921) ; *see* Tube Prods. of India v. S. S. Rio Grande, 334 F.Supp. 1039 (S.D. N.Y.1971).

20. Demsey & Associates v. S. S. Sea Star, 461 F.2d 1009 (2d Cir. 1972) ; American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449, 451–452 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076,

solely from the negligence of the charterer or its agents.[21]

Under the applicable law, the court finds no basis upon which to exonerate the vessel from liability, whether the damage to the cargo was sustained while it was still aboard the vessel, or during discharge from the vessel to the pier, or thereafter while stored overnight in the unprotected shed.[22] While the cause of the damage was the result of the failure of the charterer Atlantic Lines Ltd. to discharge its statutory and contractual duty, the vessel is cast in liability to the consignee for the resulting damage to its cargo.

■ However, the ultimate liability should be borne by defendant Atlantic Lines Ltd., which was primarily responsible for the damage. The vessel carried the goods, without damage, to the pier designated by plaintiff and Atlantic Lines. The discharging operation was at all times under the control of Atlantic Lines, the charterer. Its personnel or agents directed all activities with respect thereto. The damage to the cargo was the result of the negligent conduct of Atlantic Lines in its discharge of the cargo. It has not been shown that the vessel played any significant part in such operations. Accordingly, the defendant vessel is entitled to indemnity from defendant Atlantic Lines Ltd.,[23] including reasonable attorneys' fees.[24]

The plaintiff is entitled to judgment against the defendants in the sum of $40,840, the amount the parties stipulated as the sound market value of the cargo at the time of arrival. Judgment may be entered accordingly.

The foregoing shall constitute the court's Findings of Fact and Conclusions of Law.

96 L.Ed. 1370 (1952); see Bulkley v. Naumkeag Steam Cotton Co., 65 U.S. (24 How.) 386, 393–394, 16 L.Ed. 599 (1860); Interstate Steel Corp. v. S. S. Crystal Gem, 317 F.Supp. 112, 119 (S.D. N.Y.1970).

21. Demsey & Associates v. S. S. Sea Star, 461 F.2d 1009 (2d Cir. 1972); United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D.N.Y.1965); see Tube Prods. of India v. S. S. Rio Grande, 334 F.Supp. 1039 (S.D.N.Y. 1971); cf. Nichimen Co. v. M. V. Farland, 462 F.2d 319 (2d Cir. 1972).

22. Cf. Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800, 807 (2d Cir. 1971); David Crystal, Inc. v. Cunard S. S. Co., 339 F.2d 295, 297 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965).

23. See Nichimen Co. v. M. V. Farland, 462 F.2d 319 (2d Cir. 1972); Demsey & Associates v. S. S. Sea Star, 461 F.2d 1009, 1017 (2d Cir. 1972); A/S Brovanor v. Central Gulf S. S. Corp., 323 F.Supp. 1029 (S.D.N.Y.1970); Interstate Steel Corp. v. S. S. Crystal Gem, 317 F.Supp. 112, 119 (S.D.N.Y.1970).

24. See Nichimen Co. v. M. V. Farland, 462 F.2d 319, 333–334 (2d Cir. 1972); A/S Brovanor v. Central Gulf S. S. Corp., 323 F.Supp. 1029, 1033 (S.D.N.Y. 1970); United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833, 841 (S.D.N.Y.1965); cf. David Crystal, Inc. v. Cunard S. S. Co., 339 F.2d 295, 300 (2d Cir.1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965).