**WARNER BARNES & CO., Limited, et al. v. KOKOSAI KISEN KABUSHIKI KAISHA.***

**COMPANIA GENERALE DE TOBACOS DE FILIPINAS v. SAME.**

**THE GLASGOW MARU.**

Nos. 222, 223.

Circuit Court of Appeals, Second Circuit.

March 6, 1939.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill, and Barton P. Ferris, both of New York City, of counsel), for appellants.

Crawford & Sprague, of New York City (George C. Sprague, Roy W. Chamberlain, Nicholas J. Healy, III, all of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is the usual case for cargo damage: it concerns certain parcels of "centrifugal" sugar, shipped in bags in the Philippines, and delivered by the respondent's ship, "Glasgow Maru", at Philadelphia and Savannah in the month of May, 1934. The issues, as finally limited by the parties, are whether the sugar was shipped in good condition; and if so, whether it was properly ventilated—wind and sea permitting —during the voyage. A subsidiary question is whether the ship was overloaded; but this is relevant only so far as it might

*Judgment modified on rehearing 103 F.2d 430.

be thought to add to the probability that the hatches and ventilators could have been more often opened than they were. The parties do not differ about the law: they agree that the shipper must show that the sugar was in good condition when delivered; that the ship must bring the damage within an exception in the bills of lading; and that if she does, the shipper must show negligence. While the shippers do not agree that the damage fell within the exception for "sweat" or for "inherent vice", it is entirely plain that it did, and we may confine ourselves to the first and third of the questions just stated. The district judge has carefully stated the facts in extenso, and since the decision will not have any general importance, we shall not repeat what he said, but assume a familiarity with it. The S. S. Glasgow Maru, D. C., 19 F.Supp. 530.

■ He did not find whether the sugar was in good order when shipped, contenting himself with saying that, if it was, the damage arose from sweat in the holds, which was not shown to have been caused by the ship's neglect. So far as the condition of the sugar is an essential element in the shippers' recovery, it therefore comes to us as res nova. It is true that the libellants made no proof beyond the recital in the bills of lading that the bags were in apparent good order—which told nothing of the inside—but we may consider the outturn itself as evidence. The Africa Maru, 2 Cir., 54 F.2d 265; The Matilde Peirce, 2 Cir., 32 F.2d 688. The ship lifted about 128,000 bags at three Philippine ports, of which all turned out good except about 11,-000; less than nine per cent. The best conclusion which can be drawn from the testimony is that some of the bags in the bottom tiers away from the turn of the bilges were among those damaged. This is implied in Theus's and Buckingham's testimony, although it is not without some ambiguity. At Philadelphia the number of damaged bags in the bottom tiers was nearly one in six of the whole, which seems too much if the damage was confined to the turn of the bilges. These inside bags on the bottom tiers could not have been damaged by sweat; the damage to them, if any, must have been from "inherent vice", and have come from "migration" of syrup by gravity. Horn, a distinguished expert, thought that the vapor moisture might also "migrate" to the edges of the stow, leaving the inside unaffected, but that was plainly a speculative conclusion. Besides, it is impossible to see why in that case the top tiers, as well as those which faced the bulkheads, were not affected. We cannot of course suppose that all the sugar was in good condition except that which chanced to have been stowed in the bottom tiers inside the turn of the bilges; on the other hand it is not necessary to say that all was shipped in bad condition because syrup gathered in the bottom tiers. The most reasonable solution seems to us to be that the sugar was all in fairly transportable condition, but not altogether immune to the generation of some syrup which sank to the bottom, and injured bags not exposed to the ship's sweat.

■ The most serious evidence to the contrary is the difference in damage between the Manilla parcels and those lifted at Nasugbu and Bais. The average loss upon the first was only four per cent; upon the the second, ten, which certainly suggests very strongly that the Manilla parcels were of better quality. This is not, however, as conclusive as appears at first blush. For example, one Manilla parcel—"C.A.T.L."—was stowed in the after end of hold two, just forward of about three-fourths of that parcel, shipped at Bais, marked "C.A.B.", which filled hold three. The damage to "C.A.T.L." was not far from six per cent, and that to the whole of "C.A.B." averaged eight; so that it is entirely possible that "C.A.T.L." was damaged to about the same degree as the part of "C.A.B." which was in hold three. Again, all of the other Manilla parcels—"C.A.T."—was stowed in hold four just abaft the engine room. The rest of this hold was filled by 13,000 bags of ⟨R⟩ —about a quarter of that mark— but since we do not know how much those bags were damaged, we can make no comparison between them and "C.A.T." Thus the deduction to be drawn from the difference in damage is not reliable: it is possible that it resulted from differences in exposure to sweat. It is true that the master, the chief officer and the third officer testified that the sugar loaded at Nasugbu had been brought to the pier during heavy rains, inadequately protected, and that they had refused to accept the cargoes of three lighters because they were wet. The master also swore that wet sugar had been tendered at Bais, and that all the sugar there delivered had also been poorly protected en route to the pier. Moreover, there was an entry in the log recording the refusal at

Nasugbu, which in ordinary circumstances would have gone far to confirm this testimony. Unfortunately—as will appear when we come to discuss the log—we are forced to believe that this entry was interpolated for the purposes of the trial; very clearly it has been written over something else which was rubbed out, and which seems to have included two entries made at different hours. This fabrication discredits the testimony along with the document, and we see no reason to think that the sugar was either wet or unprotected. When the whole evidence is summed up, the weight of it—though not indeed conclusive—seems to us to support the conclusion that the sugar was delivered in reasonably good condition. These are the factors on which we rest. The bags appeared good on receipt; the outturn was sound throughout, except for damage when the sugar was exposed at the wings, and a little—somewhat doubtful —damage at the bottom tiers. The damage at the wings is easily accounted for by sweat; the sound condition at the bulkheads cannot be accounted for on the claimant's theory of general vapor "migration". The damage at the bottom tiers, if it existed, did not presuppose any general bad condition through the cargo; but was consistent with reasonably good condition. The log had been tampered with, in an effort to make it appear that the sugar had been wetted before shipment. In The Niel Maersk, 2 Cir., 91 F.2d 932, there was no such combination of evidence.

■■■■ There remains, therefore, only the issue of bad ventilation. All the Philadelphia surveyors agreed that it was bad ventilation which caused the wing damage and indeed all but Buckingham included the bottom damage as well. Theus and O'Connor at Savannah were at best only noncommittal. The voyage across the Pacific had not been severe except for about twelve days at the end of March, and with good care the sugar ought not to have been damaged in those waters. When the ship reached Philadelphia, all her cowl ventilators had been unshipped and the stumps plugged and covered. Her master explained this by saying that he had apprehended severe weather after leaving Cuba, had then unshipped the cowls and substituted wing ventilators, because they could be more easily taken down in heavy weather. It is difficult to see why this was not equally true throughout the voyage, or why on this leg he should have been so fore-handed. Certainly nothing in the event justified this precaution. But we are not left to surmise in order to discredit the ship's story. At Philadelphia a number of surveyors and weighers examined the stow and declared that some or all the cowls were stowed in the tween decks of holds two, four and five, behind the sugar, in such a way that they could not have been used during the voyage. There is not the least reason to disbelieve these men; nor did the judge do so—he merely made no finding as to what they said. Furthermore, several of them saw no wing ventilators in place on the day the ship reached port, and one of them saw such a ventilator being actually rigged on the day following. It is true that the master, the third officer and the boatswain all swore that the cowls had been used until the ship got out of the Caribbean, and they backed their testimony with the log; but the condition of this document was far from prepossessing, for it had been repeatedly erased and written over, and had suffered interpolations. Nobody disputes, or could dispute, this, and the question really is what its condition had been before the sugar was found to have been damaged at Philadelphia. The ship maintains that there had been regular entries as to ventilation, made in due course; and that the changes were only to amend the infirmities of the chief officer's English, who had adopted a uniform, routine formula: "carefully hatch ventilation attended to." The third officer had confessedly gone over most of these entries and made them more explicit, usually including some mention of the hatch boards and the ventilators. Several of the entries make it clear that the chief officer's formula had originally been written down, and there was not necessarily anything sinister in the changes, though courts of admiralty are always sensitive as to the integrity of logs. The Corinthian, 11 Asp.Cas.,N.S., 208; The Silver Palm, The Chicago, 9 Cir., 94 F.2d 754. But three of the surveyors or weighers looked over the log at Philadelphia; two, with a special eye for any entries touching ventilation, and they all found none. Two also asked the chief officer whether there were any such entries, and he said that there were not. These were not casual examinations; and, although a single person might miss some, or even all, of the seventy-five entries, it is scarcely conceivable that none of the three should have hit upon a single one. Against this testimony that of the officers alone

surely should not stand. The judge also thought it should not, but he was persuaded by the testimony of one, Stein, whom everyone agrees to be worthy of belief.

Stein got the log on the morning of May 10th: the last surveyor to see it was Campbell on the morning of the 9th. In preparing the ship's protest Stein noted down from the log only five mentions of ventilation: one of those had been written over the chief officer's formula; in another, that formula appeared, but was crossed out. Stein could not say whether he had missed other entries and of course he may have, but, assuming he did not, between May 9th and May 10th only five such entries had been made, together with the entry regarding the refusal of three lighters at Nasugbu. The problem still has some difficulties. It is true that the interval between Campbell's and Stein's examinations was long enough for the chief officer to have written over the log in the places where the challenged entries appear, and for the third officer to have corrected these, where they were corrected. Yet it is curious, if that was done, that Stein did not note more than five entries; and it seems impossible that a second emendation should have taken place after he had made the notes for his protest. In particular, if the third officer had once corrected the chief officer's entries, we can hardly suppose that the chief officer would have gone at it again without the third officer's cooperation. However, of this much we can be positive, either Stein did not think it important to note more than five or six entries, or the rest were added later. The first need not disturb our conclusion as to fabrication, and the second completely demonstrates it. Be that as it may, the condition of the log and the unsatisfactory explanation of it, coupled with the testimony of those who freshly examined it, are enough; we cannot avoid the conclusion that it had been dressed up to excuse the ship's faults. That goes much further than merely to discredit the document itself; it is positive evidence upon the very issue, and weighty evidence as well. Wigmore § 278. When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt. We so conclude here: we find that the ventilation had not been properly attended to, and had caused undue

sweat which did the damage in question. Therefore, although it will be necessary for the libellants to show which, if any, of the damaged bags were in the bottom tiers, away from the turn of the bilges, they may take a decree for the rest.

Decree reversed: causes remanded.