## McNEELY & PRICE CO. v. THE EX-CHEQUER et al.

### No. 305 of 1947, Admiralty.

United States District Court,
E. D. Pennsylvania.

Sept. 28, 1951.

Clark, Brown, McCown, Fortenbaugh & Young, Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw, Philadelphia, Pa., for respondents.

KIRKPATRICK, Chief Judge.

This is a suit in admiralty for damage to a cargo of goatskins found, on arrival at Philadelphia on October 23, 1946, to have been injured by having been wet at some time. The skins were in bales covered with burlap and had been loaded at Djibouti on August 24, 1946, on which date three bills of lading acknowledging receipt in good order and condition had been issued.

In cargo damage cases where the goods are found to be damaged on arrival, proof of delivery to the carrier in good condition makes a prima facie case of liability and throws upon the carrier the burden of disproving negligence. Delivery in good condition (or, more accurately, delivery free of the damage complained of) is an essential part of the libellant's case, and the burden of proof is upon him to show it.

With shipments originating in distant ports, firsthand evidence of the condition of the goods, as well as evidence of their packaging, custody and transportation to the ship's side by the shipper, is often, as a practical matter, unobtainable. A receipt or bill of lading acknowledging that the goods were received in good order and condition, or apparent good order and

condition, goes part way toward meeting the libellant's burden. However, in the case of packaged goods, it will not of itself be sufficient where the damage is of a kind which could have been present without showing anything wrong on the exterior of the packages when the goods were delivered to the carrier. Apparent good order and condition in the bills of lading furnishes "only prima facie proof of the external condition of the bags", The Niel Maersk, 2 Cir., 91 F.2d 932, 933, and tells "nothing of the inside", The Glasgow Maru, 2 Cir., 102 F.2d 450, 451. In such case further evidence is needed.

The Court, in addition to the good order receipt, "may consider the outturn itself as evidence", The Glasgow Maru, supra, 102 F.2d at page 451. Of course, this means more than just the fact that the goods are damaged. There must be something about the condition of the goods themselves or their stowage or other circumstances from which the Court can infer that the only damage appearing at discharge did not exist at the time the goods came into the possession of the carrier. Of course, if the damage is of a kind which could not in the nature of things have occurred before shipment, that will be enough. Fire damage of unmistakably recent origin and, in most cases, salt water damage would be examples. Expert opinion as to the earliest date when the damage could have occurred, based upon its nature and the extent to which it has progressed, may also be considered. In McNeely & Price Co. v. Ellerman v. Bucknall S.S. Co., Limited (The City of Windsor (a goatskin cargo case) D.C., 100 F.Supp. 339, Judge Kalodner relied strongly for his finding of liability upon expert testimony that the condition of the goods indicated that the damage was not over four months old, which would place its inception after shipment.

Applying the foregoing principles to the case now before the Court, I am of the opinion that the libellant has failed to meet its burden of showing that the goods, when delivered to the ship, were undamaged.

This shipment originated at Addis Ababa and consequently had to be transported some hundreds of miles to the dock. There is no evidence as to when the skins were packed, how long they had been en route or at the dock, or what protection they had prior to loading. During the days of actual loading the ship's log shows that the weather was fine and clear, but the country is one in which, during August and September, heavy rain squalls come up suddenly, lasting perhaps only a few minutes, being immediately followed by a hot sun. If one of these squalls, which a witness described as "terrific", though brief, had wet the packages some time before loading, the sun would have dried the exterior in a short time and the burlap wrappings would not necessarily have shown any sign of it.

The evidence offered by the libellant, in addition to the clean bill, showed that the damage disclosed at two surveys (one in the raw and one after partial processing) was unusually extensive. In each of a number of the bales one entire side was stained and water stains showed at various places on many others. The skins themselves were described as "rotted, putrefied, really had been badly wetted". On a number of the damaged bales the burlap covers were "rotted to disintegration". The burlap itself was entirely dry at the time of the survey.

The libellant's surveyor did not commit himself by any opinion as to how long before the survey the damage originated beyond saying that "manifestly it was old, I mean, not a matter of a week or ten days" or, as he later said, "two weeks". He also said, "If you took them out of a warehouse today, when they got wet three years ago, they would still look that way".

The evidence shows that the cargo was properly stowed, that there was no wet cargo in the same holds with the goatskins, that there were no water pipes running through the holds and that the holds were properly ventilated by blowers which were operated continuously during the voyage. The cargo was regularly inspected, hatches were kept closed during the voyage and loading was done only in clear weather.

The libellant argues that the nature of the damage is an indication that the wetting occurred on the voyage and not before, and that, since the skins in all other respects were sound, good condition on receipt should be inferred. The fact that entire flat sides of some of the bales were stained permits, but does not compel, an inference that these bales had been standing in water at some time. If they had been, it would be more likely that it was on the ship than anywhere else, although, inasmuch as they were stowed on two layers of dunnage, there would have to be a good deal of water in the holds. As opposed to this, the respondent's expert testified that, if these flats had been wet by water from the deck of the ship, they would have shown rust marks, and the survey did not disclose any rust marks. In addition, these bales were stowed in tiers, and, if they had been thoroughly soaked before shipment and then dried off outside, the moisture would have come through more extensively on the under flats of the bottom tiers than anywhere else and would account for the appearance of one-sided wetting. In such case, too, the stains would be expected to correspond with the wet portions of the skins underneath.

There was also evidence that at Jersey City seven chests of tea out of a total of about 3,400 were wet on one side. This is a very small percentage, covering an area of not more than three feet square. Some of the other cargo stowed in these holds also showed signs of wetting but the damage to it, as reported by the surveyor at Jersey City, was very slight. Certainly if, on the voyage, enough water had entered the holds, in which these bales of goatskins were stored, to saturate them to the extent that they appeared to have been[1] and in the manner in which the libellant argues that they were, one would expect to find evidence of more extensive wetting than this in the rest of the cargo.

In the City of Windsor case, supra, Judge Kalodner considered the fact that "the internal damage corresponded with the external wetting as manifested by the stains on the burlap" (a condition existing in the present case) as evidence that the bales had not been wetted before being put aboard the vessel, dried out and been wetted again. The inference is one which the Court may properly draw but not in all cases a necessary one. In this case the undisputed testimony shows that if these bales had been wet in the interior, though dry on the surface, when loaded, the water would have come or been pressed to the surface during the voyage and would have stained the packages in the way these packages were stained. Of course, as has been pointed out, in the City of Windsor case, there was also very strong evidence that the wetting was of such recent date that it must have occurred on the voyage. So far as any inference can be drawn from the evidence on this point in the present case, it is to the contrary.

Decree for the respondent.

---

1. Of a total of 72,000 goatskins 2,591 were so thoroughly soaked and rotted as to be totally valueless and 6,920 more were at least 50 per cent damaged.