**COPCO STEEL & ENGINEERING COMPANY, Libellant,**

v.

**S/S ALWAKI, her engines, boilers, etc.**
and
**Black Diamond Steamship Corporation, and Van Nievelt Goudriaan & Co.'s Scheepvaart Maatschappij, N. V., Respondents.**

United States District Court
S. D. New York.

May 6, 1955.

Bigham, Englar, Jones & Houstons, New York City, by John W. R. Zisgen, New York City, of counsel, for libellant.

McNutt & Nash, New York City, by Donald B. Allen and James E. Freehill, New York City, of counsel, for respondents.

EDELSTEIN, District Judge.

This is a suit in Admiralty for non-delivery of and damage to cargo. It was delivered to the S.S. "Alwaki" at Antwerp, Belgium, for transportation to Baltimore and ultimate delivery to libellant. The shipment consisted of 537 lifts, each weighing about one ton, of structural steel shapes, each about 30 feet long and with approximately 75 in each bundle. The bundles were not covered but the steel was banded together at several places. At the time of the receipt of the steel on board ship a bill of lading was issued acknowledging receipt of the shapes in apparent good order and condition. Libellant claims that when the steel shapes were discharged at Baltimore they were badly rusted, nicked, bent and cable burnt. In addition, libellant claims the value of one bundle which it alleges was not delivered at all from the ship.

The voyage being one in foreign trade, the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., governs the transportation of the shipment. Under that Act, in order to make out a prima facie case, the libellant must prove that his goods were loaded in good condition and outturned damaged. To establish the first element, libellant offered in evidence the bill of lading acknowledging receipt of the cargo in good order and condition. But the steel shapes were bundled in such a manner that only the outer layer of bars was visible on each bundle, except for the extreme ends of the inner layers. The condition of the ends of the inner bars could not divulge the condition of the remainder of the lengths, and in any event the ends were scrapped in the manufacturing process. The bill of lading with its statement of apparent good condition is only initial proof of freedom from open and visible damage prior to transportation. Stirnimann v. The San Diego, 2 Cir., 148 F.2d 141, 143; The Glasgow Maru, 2 Cir., 102 F.2d 450, 451; Albers Bros. Milling Co. v. Hauptman (The Nelson Traveler), 9 Cir., 95 F.2d 286, 288; The Niel Maersk, 2 Cir., 91 F.2d 932, 933; McNeely & Price Co. v. The Exchequer, D.C., 100 F.Supp. 343, 344; The Caterina Gerolimich, D.C.E.D.N.Y., 43 F.2d 248, 251. There is no dispute that the inner bars of the bundles were not discernible, prior to transportation, for the determination of their condition. Consequently, for these bars, the prima facie case has not been made out. No other evidence was presented on their good condition at the time of shipment, and this is not a case where the outturn may be considered as evidence. See The Glasgow Maru, supra. Therefore, except for the 245 bundles to be discussed, libellant cannot recover for damage to the inner bars. But for the visible outer layers of bars in the bundles, libellant made a prima facie case, the bars having been discharged rusty.

■ It then became the burden of the respondents to exculpate themselves by proving that the damage resulted from an excepted cause for which they were not statutorily liable, or that they exercised due diligence to avoid and prevent the harm. The statutory exceptions relied on were inherent vice, 46 U.S.C.A. § 1304(2) (m), and insufficiency of packing, 46 U.S.C.A. § 1304(2) (n). On the latter issue, the evidence clearly indicated that the packing was not improper, but was customary and usual for the type of cargo involved. For the rust damage, the defense of inherent vice established that the steel was subject almost inevitably to a "light atmospheric rust". Though the evidence was contradictory, I have found that the rust damage consisted of a more serious condition referred to as "flaky rust", which is not accountable for by an inherent vice of the cargo. But respondents further contend that this condition could have occasioned no loss to the libellant because the bars were in any event destined to be "pickled" before use in the manufacturing process. It is the expense of the pickling process that is claimed as damages for the rusty condition. There was contradictory evidence on the issue of whether or not the bars were to be pickled in the absence of the rusty condition complained of, but it appears to me that the more convincing evidence, from the testimony of witnesses most competent to speak, points to the finding that the bars were pickled only because of their rusty condition.

The respondents attempted to meet their burden of proving due diligence to prevent the rust damage, 46 U.S.C.A. § 1304(2) (q), largely by the testimony of the master on stowage and ventilation. Suffice it to say that such evidence was unconvincing and unpersuasive. The witness during his testimony stated and reiterated that he couldn't remember details because the voyage had occurred five years previously. But he had had a considerable experience in transporting steel cargo from Antwerp and the impression he gave was that he was testifying about his general experience rather than about the specific voyage in issue. The evidence on the issue of due care was insufficient to exculpate the respondent for the rusting of the outer bars.

■ However, the situation is quite different for 245 of the bundles. The shipping permit which served as a mate's receipt recites that when received by the carrier, 245 of the bundles had a slight atmospheric rust. Nevertheless, respondents issued a clean bill of lading after exacting from the forwarding agent of the shipper a letter of indemnity. The bill of lading was purchased by libellant for value without notice of its falsity. Had the rust in fact consisted of slight atmospheric rust when the steel was received aboard, the misrepresentation would have been of no significance, for such rust comes off in the manufacturing process and causes no loss. But I have found as a fact that the rust consisted of "flaky" rust, on the testimony of the chief officer who was the only witness present during the loading. Respondents are therefore estopped to deny that the 245 bundles were received in good order. Higgins v. Anglo-Algerian S.S. Co., 2 Cir., 248 F. 386; Olivier Straw Goods Corporation v. Osaka Shosen Kaisha, 2 Cir., 27 F.2d 129. And inasmuch as they outturned damaged, and the respondents have failed to meet their burden of proof under the statutory exceptions and on the issue of due care, the libellant may recover on the 245 bundles for rust damage.

■ On the issue of mechanical damage, however, which is limited to the outer bars of all the bundles, I am convinced that the goods were subject to the inherent vice of bending, nicking and cable burning, and that no more of such damage occurred than was inevitable in the circumstances. The cross-examination of the pier superintendent might at first blush indicate that the mechanical damage must come from careless handling, but the true import of his testimony was that such damage is inevitable in the handling of lifts of one ton bundles consisting of relatively thin bars 30

feet long. It is quite understandable that, upon loading or discharge, the slightest contact of such heavy bundles, bound and packed as they were, with any object, such as a hatch coaming, would occasion pressure that would cause more than the slightest mechanical damage; and it is quite unreasonable, in view of the dimensions of the bundles and the dimensions of the hatches, to expect a complete absence of contact. The respondents having brought themselves within the statutory exception of inherent vice, they will not be held liable unless it appears that their negligence contributed to the damage, and the burden of proof on that issue is on the libellant, Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. The libellant has failed to meet its burden of proving negligence, and therefore, the respondents are not liable for the mechanical damage.

■ On the issue of short delivery of one bundle, there is no dispute that 537 bundles were received on board ship and that the tally on discharge disclosed only 536 bundles. But respondents urge that this was obviously a mistake by the tally clerks who worked at night on the job, and this argument is reinforced by the testimony of libellant's warehouse superintendent that he checked the number of bundles against the bill of lading and found the number to be correct. However, it appears that he did not personally check the lots upon arrival nor did he see all the figures or records of the person who did. On the other hand, the tally man who testified was not willing to impeach his tally. I agree that it is strange for a ton of steel bars 30 feet long to have been lost, stolen or misplaced, but I decline to speculate. On the evidence, I find that there was a short delivery of one bundle.

Accordingly, I make the following findings of facts and conclusions of law:

## Findings of Fact

1. Libellant and respondents are corporations. At the times here material, respondent Van Nievelt Goudriaan & Co.'s Scheepvaart Maatschappij was the owner of the S.S. "Alwaki", and it and respondent Black Diamond Steamship Corporation operated her as a common carrier of goods between Antwerp and Baltimore. When the libel was filed, the "Alwaki" was within the jurisdiction of this court.

2. In August, 1948, libellant ordered from a Belgian supplier a quantity of structural steel shapes. To pay for them, it procured Irving Trust Company to issue an irrevocable letter of credit in the seller's favor. In the letter of credit, Irving Trust Company agreed to honor sight drafts accompanied by on board bills of lading for the material ordered.

3. On December 30, 1948, Irving Trust Company notified libellant that it had paid a sight draft drawn under the letter of credit, covering a shipment of 537 lifts or bundles of structural steel shapes covered by a bill of lading which was transmitted with the notice, and that it had debited libellant's account with it for the amount of the draft.

4. The 537 lifts or bundles of structural steel shapes had been delivered to respondents and placed on board the S.S. "Alwaki" on or about December 21, 1948 at the port of Antwerp, to be transported by respondents as common carriers on the steamship "Alwaki" from the port of Antwerp, Belgium, to the port of Baltimore, Maryland, in consideration of an agreed freight and in accordance with the valid terms and conditions of a certain bill of lading, No. 3, issued to the shipper of the goods.

5. Each lift or bundle weighed approximately one ton and contained approximately 75 distinctively shaped steel bars or rods, most of which were 30 feet in length and were nested and banded together with a series of metal straps, but not otherwise packaged or protected. This method of packing was the proper, usual and customary method employed for cargo of this type.

6. At the time the steel was received by respondents and the S.S. "Alwaki" at Antwerp and also upon discharge and

delivery at Baltimore, the condition of the interior bars of each lift was not visible and was not made known.

7. The bill of lading acknowledged receipt on board the "Alwaki" of 537 bundles of structural steel shapes, in apparent good order and condition. Libellant had no knowledge or information, at the time it received the bill of lading, that the statements in it about the number of bundles received on the vessel, or their apparent condition at that time, were in any respect false.

8. In fact, at the time of receipt of the steel by respondents and the vessel at Antwerp, the external bars in 292 of the bundles or lifts were in apparent good order and condition; but 245 of the lifts or bundles were rusty when laden to the "Alwaki", and respondents exacted from the shipper's forwarding agent a letter of indemnity as a condition precedent to issuance of the clean bill of lading.

9. The "Alwaki" arrived at Baltimore on January 7, 1948, after a normal winter voyage, which did not require curtailment of the ventilation of the cargo compartments.

10. Only 536 lifts or bundles of the steel shapes were discharged, one fewer than had been laden at Antwerp.

11. At the time of discharge, the shapes comprising numerous bundles were bent, nicked and cable burnt; and the shapes comprising all the bundles were rusted.

12. The damage of bending, nicking and cable burning resulted from an inherent vice of the goods, and the damage was not contributed to by respondents' negligence.

13. Shipments of bundles of steel shapes such as those here involved sometimes outturn after an ocean voyage covered with a slight atmospheric rust, which is easily removed, and is not commercially harmful.

14. The rust on this shipment on discharge at Baltimore was a heavy flaking, scaly rust, which is neither usual nor inevitable, and constituted a damage.

On the nature of the rust damage, the respondents have neither called their natural witnesses who could have given evidence on the point, nor accounted for their failure to do so.

15. The steel bars would not have had to be "pickled" if they had not been rusty with a heavy, flaking, scaly rust.

16. The rust damage was not a result of an inherent vice of the goods or of an insufficiency of packing. Nor did the respondents prove the exercise of due diligence to prevent such damage.

17. Two hundred and forty five lifts or bundles of shapes were rusted when laden at Antwerp, and there is evidence that the rust was flaky. Issuance of a clean bill of lading for them was fraudulent, and resulted in damage to libellant.

### Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter of this suit.

2. Respondents and the S.S. "Alwaki" were common carriers of libellant's goods. Their responsibilities are measured by the Carriage of Goods by Sea Act.

3. Libellant has established a prima facie case of non-delivery of one bundle, and respondents have not borne the burden of explaining the non-delivery.

4. For the 245 bundles rusty when laden, respondents are estopped to deny that the damage occurred in their custody, and they have not borne their burden of proving that the damage occurred as a result of the inherent vice of the goods or of insufficiency of packing or of any other statutory exception. Nor have they borne the burden of proving due diligence to prevent the rust damage.

5. For the remaining bundles, libellant has established a prima facie case on the rust damage to the outer layers of bars, but has failed to establish a prima facie case for such damage to the interior bars not visible when loaded.

6. Respondents have not borne their burden of proving that the rust damage to the outer, visible bars occurred as a

result of the inherent vice of the goods or of insufficient packing or of any other statutory exception. Nor have they borne the burden of proving due diligence to prevent the rust damage.

7. For the mechanical damage to the outer layers of bars on all bundles, the libellant has established a prima facie case, but has failed to establish a prima facie case for such damage to the interior bars.

8. Respondents have met their burden of proving that the mechanical damage to the outer layers of bars was the result of an inherent vice of the goods. Libellant has not borne its burden of proving that respondents' negligence contributed to the damage.

9. Libellant is entitled to a decree, with interest and costs, against the respondents and against the S.S. "Alwaki" for the short delivery of one bundle, for the rust damage to the 245 bundles rusty when laden, and for the rust damage to the outer bars on the remaining bundles, with a reference to a commissioner to ascertain and compute the extent of the damages. Libellant is not entitled to recover for the mechanical damage.