COPCO STEEL & ENGINEERING COMPANY, Libelant,

v.

THE PRINS WILLEM VAN ORANJE and Maatschappij Zeetransport N. V. in a cause of contract and cargo damage, civil and maritime, Respondents.

Civ. No. 9628.

United States District Court
E. D. Michigan, S. D.

April 9, 1957.

Order Denying Motion to Amend
Oct. 14, 1957.

Decree for the libelant.

Miller, Canfield, Paddock & Stone, Detroit, Mich., for plaintiff.

Foster, Lutz & Meadows, Detroit, Mich., for defendant.

KOSCINSKI, District Judge.

This is an action in Admiralty for rust damage to steel shipped from Antwerp, Belguim, on August 16, 1949, on board the S. S. Prins Willem Van Oranje for delivery to libelant at Detroit, Michigan, where it was outturned on September 11, 1949.

Suit was filed on July 31, 1950. The libel and complaint alleges that 158 lifts (290 tons) of structural steel shapes were delivered to respondents in good order and condition for transportation and delivery in like condition, under the terms of the bill of lading, but were delivered seriously damaged by rust, to libelant's damage of $5,000, as nearly as the damage could then be estimated. At the pretrial hearing libelant particularized its damage as the cost of pickling 261 tons (143 lifts) of the steel at $17 a ton, or $4,437. At that time libelant also charged improper stowage, directly above the steel, of many crates of tulip bulbs which it claims are productive of moisture.

The answer denies liability and alleges as defenses an exemption from liability for rust damage in the bill of lading, a statutory exemption from liability for damage arising from an inherent vice of the goods and from insufficiency of packing, failure to give notice of claim as required by law, absence of exceptions on the tally sheets upon discharge of the cargo, lack of knowledge by respondents as to the actual condition of the inside bars of steel in each bundle which were not visible at the time of loading, and delivery of the steel in a condition not substantially different from its condition upon loading. All of these defenses were raised at the trial.

Libelant, a manufacturer of steel window frames, began importing steel late in 1948 when shipments arrived on three vessels, including the S.S. Alwaki. This shipment was next and was followed by another on the S.S. Prins Frederik Hendrik which arrived about two weeks later. All steel shipments to that date resulted in rust damage claims and led to some litigation. See Copco Steel and Engineering Co. v. The Prins Frederik Hen-

drik, D.C., 129 F.Supp. 469, and Copco Steel & Engineering Co. v. S/S Alwaki, D.C., 131 F.Supp. 332. As to the rust damage these cases are identical on facts except that the tulip bulb and steel cargo combination was not involved in the Alwaki case and in the Hendrik case the crates of tulip bulbs and the steel in one of the holds were found to be dripping of moisture while in this case both the bulbs and the steel were dry upon unloading.

When this case was at issue proctors requested that the court await the disposition of the above cases, which would determine some of the issues present here before scheduling a pretrial. The case was pretried in May and tried in August, 1956, some six years after filing of suit and almost seven years after discharge of the cargo.

The hot-rolled steel shapes in this case, which were approximately 20 feet long, were nested in tiers and several nested tiers were tightly banded with metal straps to form a compact bundle or lift, but they were not otherwise protected or wrapped. They were stowed at the bottom of the deck in three lower holds located in both the forward and after parts of the ship, directly beneath general cargo consisting of several hundred crates of tulip bulbs, tires, and other goods. A bill of lading was issued stating that the steel was shipped in apparent good order and condition and no exceptions were noted thereon.

This case, as were the two earlier cases, is an action on a contract for carriage of goods by sea to a port of the United States in foreign trade and is therefore controlled by the Carriage of Goods by Sea Act, 49 Stat. 1207, 46 U.S.C.A. § 1300 et seq. (Sec. 1312). The defenses of statutory exemption from liability for damage from inherent vice and from insufficiency of packing are common to all three suits. The effect of the exemption from rust damage in the bill of lading was also determined in the Hendrik case and the issue as to proof of the condition of the inside bars of steel in each bundle, upon loading, was introduced and deter-

mined in the Alwaki case. The remaining defenses are peculiar to this case only.

■ In both of the earlier cases the courts enunciated the established rule that to establish a prima facie case the shipper must prove that the goods were delivered in good condition and outturned damaged and that it thereupon becomes the duty of the carrier to assume the burden of proving that the damage was produced by a cause from which the carrier is exempted by law or that damage from a non-exempt cause resulted without the fault or neglect of the carrier.

In the Hendrik case [129 F.Supp. 470], the court considered the issue whether all "rust damage" is included within the meaning of "damage arising from inherent defect, quality, or vice of the goods" as an exemption to the carrier's liability under Sec. 1304(2) (m, n) of the Act, and found that surface rust is generally encountered on steel shapes shipped in like manner which may be removed by an incidental brushing operation, but it distinguished this type of rust from the deep rusting which occurred in some of the bundles, and a similar finding as to the prevalence of light atmospheric rust in transatlantic shipments of this kind was made in the other case. The court determined that since such excessive rusting was not within the statutory exemption, such non-statutory exemption from liability for rust damage in the bill of lading did not relieve the carrier from the burden of proving want of fault or neglect under Section 1304(2) (q) of the Act. In both cases it was held that the customary method of packing such steel shipments was employed. The issue relating to the condition of the inner bars of steel upon loading is reserved for later discussion.

After disposition of the two earlier cases proctors for the libelant and respondents stipulated at the pretrial hearing that no recovery can be had for ordinary accummulation of atmospheric rust on the steel and that a factual issue for the trial will be whether ordinary or excessive rusting occurred. This stipulation is incorporated in the court's pretrial order on file in this case.

During the trial the evidence elicited the information that libelant was fully compensated for its claimed damage by the insurer of the cargo and that the action is being prosecuted on behalf of the insurer, whereupon proctor for respondents moved to dismiss this action on the ground that libelant is not the real party in interest. The trial proceeded without arguments on the motion which were to be presented in post-trial briefs. In their brief respondents state that they now withdraw this motion.

Respondents introduced at the trial the testimony by deposition of Capt. Visser, who was the chief officer in charge of the cargo on the vessel and who boarded the ship at Rotterdam, as to care of the cargo; it also introduced evidence to show that the whereabouts of the master, who was present at both the loading and unloading of the cargo, were unknown; no other testimony to show care of the cargo on the leg of the voyage from Antwerp to Rotterdam was introduced and respondents in their brief admit that they did not assume the burden of proof imposed upon them and consequently admit liability for any excessive rust damage. It is therefore unnecessary for the court to appraise the testimony of Capt. Visser on this point or to consider the defenses of exemption from liability for rust damage in the bill of lading or the statutory exemption for damage by insufficiency of packing, on which the brief is silent. The remaining defenses relate to other issues not yet discussed.

■ In its briefs libelant argues that respondents must show freedom from fault or neglect even insofar as damage from an inherent vice of the goods is concerned. Discussion as to circumstances under which such proof is necessary is omitted in view of the stipulation of record that there is no liability for ordinary rust, which was found to be an inherent vice of the cargo. Such a stipulation relieved respondents from the burden of presenting any proof whatsoever as to freedom from liability for ordinary

rust, and libelant cannot be heard now to complain that proof, which it in effect agreed before trial was not necessary, was not produced.

The issues which remain for disposition, then, are whether libelant established a prima facie case by showing that the steel was received in good condition and was outturned damaged by excessive rusting, and if so, what was the extent of that damage.

By Section 1303(4) of the Act the bill of lading is prima facie evidence of the receipt by the carrier of the goods in the condition described in the bill of lading and the clean bill of lading was introduced in evidence here.

It is contended by respondents, as it was in the Alwaki case, that the mere statement as to apparent good order and condition in the bill of lading does not relieve libelant of his initial burden of proving the actual true condition of the steel at the time it was received by respondents, and that since no testimony was introduced as to the actual condition of the bill of lading is only initial proof of freedom from open and visible damage and does not prove the condition of the inside bars of the bundle. The court in the Alwaki case sustained respondents' contention. It found that only the outer layer of bars were visible with the exception of the extreme ends, the condition of which could not divulge the condition of the remainder of the lengths, that in any event the ends were scrapped in the manufacturing process, and that libelant's prima facie case for the inner bars was not made out.

The case of McNeely & Price Co. v. The Exchequer, D.C., 100 F.Supp. 343, discusses the type of cases in which proof as to the actual condition of the cargo prior to loading is necessary:

"A receipt or bill of lading acknowledging that the goods were received in good order and condition, or apparent good order and condition, goes part way toward meeting the libelant's burden. However, in the case of packaged goods, it will not of itself be sufficient where the damage is of a kind which could have been present without showing anything wrong on the exterior of the packages when the goods were delivered to the carrier. Apparent good order and condition in the bills of lading furnishes 'only prima facie proof of the external condition of the bags', The Niel Maersk, 2 Cir., 91 F.2d 932, 933, and tells 'nothing of the inside', The Glasgow Maru, 2 Cir., 102 F.2d 450, 451. In such case further evidence is needed."

Research produced cases in which proof of actual condition was required but carriers in those cases asserted a defense that the claimed damage to the cargo occurred prior to loading. No such claim is made here though respondents in their answer disclaim knowledge of the actual condition of the inner bars at the time it received the steel for shipment and they now challenge the presumption which attached to the clean bill of lading solely on the ground that all the bars of steel were not visible.

■ This court agrees with the reasoning in the Exchequer case, supra, but it prefers to avoid categorizing of a particular cargo as either "packaged" or "non-packaged" goods which could lead to unrealistic results in many cases. It is the considered opinion of this court that proof as to actual condition of the cargo upon receipt by the carrier is necessary where the condition of the commodity itself which is to be transported is not visible from its exterior appearance, as prepared for shipment, and where the damage claimed is of a kind which could have been present at the time the cargo was received by the carrier.

■ This is not such a case. The bill of lading recited that the steel, not only the outer layers of bars, was shipped in apparent good order and condition and the statutory presumption of good condition attached to the entire shipment. The bars were not all of uniform length so that not only the outer bars and extreme ends of inner bars but even small portions of sides of projecting longer

bars were visible, a sufficient portion of the entire bundle to give a reliable indication of the condition of the invisible portion of the cargo. Considering the kind of cargo, and its properties, the type of damage claimed and its causes and effects, the inference is strong that the entire shipment was sound.

■ On proof of the condition of the cargo at the outturn Sec. 1303(6) of the Act makes the removal of the cargo from the ship prima facie evidence of delivery by the carrier in the condition described in the bill of lading unless a written notice of damage is given immediately or within three days if the damage is not apparent, but under this section a written notice need not be given if there is a joint survey or inspection. There was sufficient compliance with the statute to prevent the operation of the presumption of good condition at the outturn and the actual condition must be determined from the evidence.

Testimony on this issue was given on behalf of libelant by its vice-president Herman, John Martin, and Harold Dauncey, and on behalf of respondents by the local shipping agent and by the chief officer of the vessel, all of whom except Dauncey examined the outturn. About a month later, on October 5 and 6, 1949, Dauncey examined about 75% of the cargo at Copco's premises and a small portion of it at the pickling plant. Martin and Dauncey made written reports of the inspections which each made on behalf of the insurer of the cargo and these, together with photographs of some of the bundles and tally sheets of the outturned steel, were introduced in evidence. The tally sheets, under "Exceptions, Bad Orders, Etc.—Show Boat or Dock Damage and Cause" stated "None." A subpoena duces tecum to produce at the trial certain documents including shipping records to show how much steel was delivered for pickling was served upon libelant and it was testified on behalf of libelant that a diligent search was made for these records but that they could not be found and that such records were not available. There were no other witnesses besides those mentioned. Other documents introduced included a log book, blueprints of the steel shapes, and the stowage plan.

Martin's report states that the majority of the bundles showed signs of rust which was concentrated towards the top and sides of the bundles, the amount varying from light to heavy rust. He made no notations at the time as to the percentage of light or heavy rust.

Dauncey, who was by far the more experienced surveyor with 23 years experience at that time as a marine cargo surveyor as compared to Martin's three years experience as a packing consultant, gives the following information about the condition of the cargo in a more detailed and complete report:

"All of the lifts on hand were more or less rusted and this rusting appeared to be of 2 kinds. First, the majority of the lifts were covered with a relatively light uniform rust probably as the result of the steel having been in contact with the rain or exposed to the elements some time (in) transit and possibly prior to loading aboard the above vessel.

"A smaller amount of this steel, approximately 25%, was very heavily rusted and showed evidence of having been in contact with other cargo such as animal hair, possibly hides and asbestos fibre.

\* \* \* \* \* \*

"As stated above it is our opinion that the majority of the damage to this steel appears to have been caused by exposure to the elements and we feel that at least 195 tons were damaged by this cause. The balance of 66 tons became wet or sustained additional rusting while in stowage possibly from contact with other cargo and possibly due to excess moisture in the hold originating in the tulip bulbs or similar cargo."

The testimony of witnesses left much to be desired. A great number of cargo shipments were observed in their daily occupations since the occurrence of the events to which they testified and it was

apparent that, but for documents to refresh their memory, their personal recollection of the events was poor. To mention only a few instances here, Herman testified that he complained to the master that every time tulip bulbs were stowed with steel there was rust damage, but this was his first experience with such a cargo combination, he also testified that he was present during Dauncey's inspection of the cargo at Copco's premises and that Dauncey opened a number of the bundles and found rust, while Dauncey testified that when he examined the lifts, piled about three tiers deep, none of the bundles were removed. Martin could not recall whether steel was unloaded from both ends of the ship at the same time; proctor for libelant on behalf of whom Martin was testifying, himself had difficulty reconciling Martin's testimony as to the condition of the steel with testimony given by him on depositions only several months earlier, even after some attempts to refresh his memory by more than one reading of the other testimony from the deposition. Dauncey, whose written report states that he examined three quarters of the entire cargo, testified that he examined 90% of the cargo but admitted on cross-examination that this amount of the cargo was not available to him for inspection; asked about another cargo about which he already testified three years earlier he requested a copy of his survey so that he would know what he had written because a long time elapsed since he examined the cargo. Testimony of other witnesses cast some doubt as to whether the local shipping agent who testified was the one who was present at this outturn. The chief officer's testimony was equally indicative of only slight personal recollection of the facts.

The testimony was conflicting, libelant's witnesses testifying to occurrence of heavy rust in most of the bundles and those for respondents that no heavy rusting appeared on the steel though the majority of the bundles were covered with light atmospheric rust. One set of witnesses identified discolorations, shown in the photographs, as rust, while the others could not identify such discolorations as rust. The two survey reports which witnesses for libelant used to refresh their memory as to the condition of the steel are contemporaneous in time with the events to which they relate and furnish the most reliable source from which the condition of the steel can be determined.

Dauncey testified that the 25% of heavy rust damage given in the report relates to that percentage of rust he found scattered in 90% of the bundles. He was highly experienced in preparing such reports and therefore aware of the exactness of information they must contain and of the purposes for which such reports are intended. It must be noted that he describes all of the "lifts" as being rusted, with a relatively light uniform rust covering the majority of the "lifts", and a "smaller" (not "small") amount of this steel, approximately 25%," as heavily rusted. The choice of the last phrase indicates that he made previous reference in the report to a "larger" amount of the steel which the report gives as "the majority of the lifts". This interpretation would support his testimony that he examined 75% of the steel cargo at Copco's premises and that other bundles, except the 15 bundles which were free from any rust and those which had already been pickled and used in manufacture, were examined by him at the pickling plant. Most, but not all of the bundles, contained 180 shapes but the number of bundles in which this amount varied was not shown, so that a percentage of bundles or tons would be an approximation in either case. There was testimony on behalf of libelant to a mere discoloration which is not a rust, to light rust, and to heavy rust. In its manufacturing process steel bars with any rust are cleaned before they are placed in machines with dies and before paint is applied. Libelant found it more practical and less expensive to have all rust, whether it is light or heavy, cleaned by pickling at its pickling division which requires opening of bundles to completely

immerse bars of steel in acid baths, but a minimum of handling, as compared to individual handling of bars which is involved when bundles are opened and bars segregated. This would be true, then, whether the bars are individually handled to clean each bar with a cloth or brush or whether that is done to rebundle lightly and heavily rusted bars in separate bundles.

The Lake Erie Metal Pickling Plant to which libelant's steel is sent for pickling is a division of Copco Steel but separate records are maintained and all transactions between the parent and its subsidiary are recorded the same as transactions with other customers.

Libelant's claim filed with the insurer of the cargo was paid in full. The contingency against which the cargo was insured was not shown nor is it material here nor is the amount paid by the insurer material unless respondents' legal liability for damages in that amount is established, and it is not liable for the cost of cleaning, by any process, of steel which was damaged by an inherent vice of the cargo, under the circumstances present in this case.

Upon considering all the evidence in this case this court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Libelant and respondent Maatschappij Zeetransport N.V. are corporations and at the time here material the said respondent was the owner and operator of the S.S. Prins Willem Van Oranje. At the time the libel was filed said vessel was within the jurisdiction of this court.

2. On or about August 16, 1949, 158 lifts or bundles (290 tons) of structural steel shapes were delivered to respondents and placed aboard said vessel at the port of Antwerp to be transported to the port of Detroit, Michigan, in consideration of an agreed freight and in accordance with the valid terms and conditions of a certain bill of lading issued to libelant.

3. The 158 lifts of steel were packed in a manner which is customary for packing cargo of this type for transatlantic shipment at the time in question.

4. The bill of lading acknowledges receipt on board said vessel of 158 bundles or lifts of structural steel shapes, in apparent good order and condition.

5. At the time of discharge of the 158 bundles or lifts from the vessel, 90% or 143 lifts (261 tons) contained rust of which 25% of the bundles (66 tons) contained heavy rust and the remaining bundles (195 tons) contained light surface rust.

6. Light surface rust which can be removed by an incidental brushing operation is customarily encountered in similar transatlantic shipments directly to the port of Detroit, and the rust damage of this type in the 196 tons of steel in this cargo was caused by an inherent vice of this cargo.

7. The rust damage encountered in the 66 tons of steel in which heavy rusting occurred, was excessive in degree beyond that customarily encountered and beyond rust damage which is caused by an inherent vice of the cargo, and was neither usual nor inevitable in such shipments.

8. Respondents admit that they did not assume their burden of proof to avoid liability for such damage.

9. Libelant sustained damage in the amount of $1,122, being the cost of pickling 66 tons of the steel at $17 a ton, which was a reasonable charge.

### Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter of this suit.

2. Respondent Maatschappij Zeetransport N.V. and the S.S. Prins Willem Van Oranje were common carriers of libelant's steel. Their responsibilities are measured by the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq.

3. Libelant complied with all legal requirements with reference to giving notice of claim to respondent of damage to the cargo.

■ 4. Libelant fully met its burden of establishing that the steel shipment was received in good condition and was outturned damaged.

■ 5. Respondents are not liable for rust damage to the cargo by light atmospheric rust and were not required to produce any proof at the trial on this issue in view of the stipulation of proctors, in advance of trial, that no liability for such damage exists in this case.

■ 6. The bill of lading exception for rust damage in excess of damage caused by light atmospheric rust is a non-statutory exemption which did not relieve respondents from the burden of proving that such excessive rusting occurred without fault or negligence of their servants or agents contributing thereto. Respondents failed to sustain this burden of proof and must respond in damages for such excessive rusting.

Libelant may have a decree for $1,122, with interest and costs unless stipulated to by proctors for the parties.

### Order Denying Motion to Amend

Following a trial in this cause, the Court filed its memorandum opinion, findings of fact and conclusions of law, allowing recovery of damages by libelant in the amount of $1,122. Libelant thereafter filed a motion for a rehearing with reference to the amount of damages only, for allowance of damages in the amount of $4,437 in lieu of the amount as previously allowed, and for amendment of the memorandum opinion, findings of fact and conclusions of law accordingly.

Grounds for the motion are given, in substance, as follows:

1. The Court, by way of interpretation, rewrote a phrase in Dauncey's report though ambiguity did not exist. The report does not specify the location of heavy rust, but it is clear from the entire report that 90 percent of the bundles required pickling, inasmuch as Dauncey recommended payment of damages for harm to 261 tons of the steel. The Court's interpretation ignores this portion of the report. The report being silent as to location of heavy rust, the Court must look to Dauncey's recommendation and his oral testimony as well as that of witnesses, Herman and Martin, which shows, as does Martin's report, that rust requiring pickling was scattered among 90 percent of the bundles. There is no evidence to support the Court's finding that rust requiring pickling was confined to 25 percent of the bundles. It is uncontradicted that the product preference of libelant was to avoid pickling and that, independent of the scope of insurance coverage, libelant had to and did pickle 90 per cent of the bundles.

2. It is also uncontradicted that Copco did not pickle bundles of steel with atmospheric rust only; on the other hand, flaky rust had to be pickled to avoid damage to dies and 143 bundles bearing rust of this type were pickled at a cost of $17.00 a ton or $4,437.00. The Court's statement as to libelant's practice of cleaning rust is inaccurate insofar as it refers to bundles of steel containing atmospheric rust only.

3. The only evidence available as to location of flaky rust was offered by libelant and such evidence is clear that flaky rust requiring pickling was scattered through 90 per cent of the bundles.

The motion was heard and counsel for both sides submitted arguments thereon.

The court is in agreement with libelant that the phrase, "majority of the lifts", as used in the Dauncey report, is clear and unambiguous. Dauncey prepared the report for the insurer of the cargo, the insurance claim was settled before this case was tried, and in this action reimbursement is sought on behalf of the insurer. In view of this change of status and the fact that the testimony of the insurer's surveyor, given at the trial, seemed to attribute to the phrase a meaning inconsistent with its plain language,

interpretation of the phrase was required. Dauncey's statement that the majority of the lifts were covered with a relatively light uniform rust and a smaller amount of this steel, approximately 25%, bore heavy rust, is entirely consistent with the conclusion he reaches later in the report that 195 tons appeared to be damaged by exposure to the elements and the balance of 66 tons became wet or sustained additional rusting while in stowage. The amount of heavily rusted steel is therefore specified in the report, not only by percentage but by weight. It is clear to this court, from a reading of the report in its entirety, particularly in view of Dauncey's long experience in making such reports, that "66 tons" does not represent the combined weight of numerous rust-covered spots, scattered throughout most of the cargo, but that it is the weight of an ascertainable and identifiable portion of the cargo, "approximately 25%" of the cargo.

The following portion of the report constitutes Dauncey's "recommendation for payment of damages": Information is given to the insurer of libelant's claim that 261 tons of the steel would have to be pickled at a cost of $20 per ton, of Dauncey's finding upon investigation that this work could be done at $17 a ton and of submission of this amount to the importer. The report then states that it was finally agreed without prejudice that the 261 tons could be reconditioned at $17 a ton, and that all action in the matter was "without prejudice, subject to the terms and conditions of the policy of insurance." As the court's opinion stated, the contingencies against which libelant insured the cargo and other terms and conditions of the insurance contract are neither known nor pertinent here.

█ Martin makes no recommendation in his report but offers the opinion "that discharge and handling of the steel from the ship was well carried out, also that rust could have been prevented by using a suitable rust-proofing oil." The

court was not required to accept Dauncey's recommendation for settling the insurance claim as a basis for allowing damages and determining the amount of damages, nor Martin's opinion that the steel was improperly prepared for shipment, as a basis for denying recovery in this case. Libelant itself did not rely on the recommendation for its course of conduct as it delivered a part of the cargo to its pickling division and was already in the process of pickling that part of the steel at the time Dauncey called at its manufacturing premises to examine the cargo. He at no time saw 90% of the cargo. Martin's deposition was taken prior to trial (parts of it having been read into the record by libelant's counsel) and his testimony at that time and at the time of the trial, as to the amount of heavy rust and its location, was extremely conflicting. On deposition he was asked whether there was heavy rust on all 143 bundles (90% of the cargo) and he answered, "On certain pieces, probably, there was" (R. 126); he also testified that 50% of the bundles bore such rust (R. 113, 141); that over 50% had such rust (R. 113, 141); and that 90% of the bundles had both light and heavy rust.

In each of the related rust-damage claims mentioned in the court's opinion prompt written notice was given to the carrier by telegram or letter by Copco's Vice-President Herman, who was in charge of steel imports. During Herman's interrogation with reference to two of the other claims it appears that upon receipt of such notice arrangements were made by the carrier to have an experienced surveyor also examine the cargo on behalf of the carrier. In the instant case libelant's surveyors were on hand at the time of discharge but no notice in writing was given thereafter except for filing of this action almost eleven months later. The court held in this case that there was sufficient compliance with the statute by libelant for certain purposes, as therein stated, but libelant cannot urge, to its advantage, that respondents presented no evidence by competent surveyors. In this case, also, damage was not indicated

on tally sheets as was done in other instances. Witness Herman also testified that libelant was billed for pickling cost in all instances by its pickling division and that records were always maintained of steel delivered to and returned from its pickling division. Records in this case, however, subpoenaed by respondents for production at the trial, could not be found. The inference is also strong, from Herman's testimony given on deposition in another rust-damage case, parts of which were read into the record, that he considered the rust damage to be minor in this case, involving less than the $1700.00 claim about which he then testified.

Both Dauncey and Martin relied upon libelant's claims as to the amount of steel which it would have to pickle, as appears from the following excerpts from their reports:

Dauncey: " * * * they felt it was necessary to pickle all of the rusty bundles which was 90% of the bundles."

Martin: "It was estimated that approximately 90% of the bundles contained rusty pieces. Mr. Herman stated that this would require cleaning the entire bundle by a pickling process, as it would be difficult, also expensive from a labor standpoint to pick out and clean individual pieces."

Dauncey testified that the rusty condition of the steel was still a surface condition and had not pitted the bars or angles to any great extent. Martin testified that there was a percentage of rust that could be removed by brushing but it would be difficult because the bundles would have to be taken apart and the steel cleaned, and that there was also a percentage that would have to be pickled, " * * * that is up to the consignee. * * * He probably would save money by pickling all of it. * * * Of course, it would be more expensive, I think, myself, to brush it off and open the bundles." It was his view that steel with light rust should also be pickled.

A superintendent of Copco testified on deposition from which the following question and answer were read into the record:

"Q. What is the practice, free from your experience,—does steel having a visible rust usually get pickled before it is manufactured? A. Well, in the case of windows, I would say Yes. Any rust on the materials would be detrimental because the sash must be painted and they just cannot paint over rust and expect it to stick."

Witness Herman testified that he agreed with that statement. (R. 282, 283.) He also testified that the mere cost of opening bundles and segregating steel bars, without any cleaning whatsoever, exceeded the cost of pickling an entire bundle. His testimony, however, was not clear on this point. He testified that the cost of labor for two laborers and a crane operator to libelant was, at the time in question, $5.66 an hour, without overhead, and that it would take one hour for this crew to open the bundles, separate and rebundle the bars after segregation, but without cleaning of the bundles. (R. 233.) On cross-examination he testified that the cost of labor of the same type of crew at $4.26 an hour was charged to a carrier in another case in which a cargo was examined on behalf of the carrier, at about the same period of time, and that 60 to 75 bundles of somewhat comparable bundles were opened, segregated and rebundled by the surveyor, with the assistance of such a crew, working for parts of three or four days, about two or three hours a day. (R. 250–252.) He also testified that Dauncey examined about five bundles in exactly the same manner, although Dauncey testified that he did not remove any of the bundles from the piles.

The evidence in this case does not bear out the claims made by libelant in its grounds for the motion. Attention is directed to the court's opinion as to the type of rust damage for which compensation in damages can be claimed in this action (pp. 3, 12). Light, surface rust,

being an inherent vice of steel in imports of the type here involved; it is immaterial, therefore, that an insurer paid an insurance claim on a policy insuring the cargo against rust, or that steel with this type of rust must be removed before processing for libelant's purposes as "rust of a degree which required pickling." These matters do not affect the liability of the carrier who must respond in damages only for excessive rusting, over and above rusting which is an inherent vice of the cargo.

 In the court's opinion the evidence supports its finding that the majority of the bundles weighing 195 tons bore light surface rust and that the balance of the shipment, approximately 25% thereof, weighing 66 tons, was excessively rusted. The cost of pickling this amount of steel was awarded to libelant and the evidence does not sustain its claim to damages in an increased amount.

For reasons herein stated libelant's motion for allowance of damages in an increased amount and for amendment of the court's memorandum opinion, findings of fact and conclusions of law is hereby denied.